UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> PLAINTIFFS, <br><br> -against- <br><br> CHIROPRACTIC ASSOCIATES OF RICHMOND HILL P.C., KANTER PHYSICAL MEDICINE & REHAB, P.C., MIRIAM KANTER, M.D., P.C., MIRIAM E. KANTER, M.D., STEVEN R. NISSENBAUM, D.C., JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20, <br><br> DEFENDANTS. | CIVIL ACTION <br><br> 25-CV-715 <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (collectively "Plaintiffs" or "Allstate") by their attorneys, Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Chiropractic Associates of Richmond Hill P.C., Kanter Physical Medicine & Rehab, P.C., Miriam Kanter, M.D., P.C., Miriam E. Kanter, M.D., Steven R. Nissenbaum, D.C., John Does 1 through 20 (the "John Doe Defendants") and ABC Corporations 1 through 20 (the "ABC Corporations") (collectively, "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.     From in or about November 2001 through the date of the filing of this Complaint, Miriam E. Kanter, M.D. ("Kanter") and Steven R. Nissenbaum, D.C. ("Nissenbaum") (collectively referred to herein as the "Fraudulent Providers"), presided over separate but related enterprises that systematically stole millions of dollars from automobile insurance companies, including Plaintiffs, through New York State's No-fault system via the submission of fraudulent claims for medical and/or other good and/or healthcare related services purportedly provided to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"),

through Chiropractic Associates of Richmond Hill P.C. ("Chiropractic Associates of RH"), Kanter Physical Medicine & Rehab, P.C. ("Kanter Physical Medicine & Rehab"), and Miriam Kanter, M.D., P.C. ("Miriam Kanter MD Practice") (collectively referred to as the "Defendant PCs") .

2.    In furtherance of the scheme to defraud herein, Defendants Kanter and Nissenbaum established a medical mill in Richmond Hill, New York, that they utilized to fraudulently bill Allstate for bogus services, including but not limited to diagnostic testing, chiropractic, physical therapy, pain management, and other medical and healthcare services.

3.    The medical mill consisted of, at a minimum, a medical doctor, chiropractor, and physical therapist, all of which would treat virtually every patient presented at their location pursuant to a protocol of fraudulent treatment, irrespective of medical necessity.

4.    In furtherance of the scheme to defraud alleged herein, Defendants Kanter and Nissenbaum established a multidisciplinary clinic at 105-09 Jamaica Avenue, Richmond Hill, NY (the "Richmond Hill Clinic") at which Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice provided virtually all Covered Persons that presented at the Richmond Hill Clinic with initial and follow-up examinations, electrodiagnostic testing, computerized range of motion and manual muscle testing, chiropractic services, physical therapy treatment, and pain management injections, not tailored to the individualized complaints and medical needs of each Covered person, but rather in accordance with a predetermined course of treatment irrespective of medical necessity ("Fraudulent Treatment Protocol"), designed to unlawfully profit off of each Covered Person's No-fault benefits and maximize payments to the Defendants.

5.      At all relevant times mentioned herein, each of the Fraudulent Providers knowingly caused or allowed fictitious bills to be submitted in association with the Richmond Hill Clinic.

6.      Defendants at the Richmond Hill Clinic participated in massive billing fraud operation, routinely submitting bills to insurers, in general, and Allstate in particular, for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.  In so doing, Defendants depleted otherwise available No-fault Benefits, rendering them unavailable for any legitimate treatment they may have needed.

7.      Defendant Kanter is well acquainted with how to devise and carry out a scheme to defraud such as that alleged herein.  By way of example and not limitation, in the matter of *Allstate Insurance Co., et al. v. James A. Spina II, D.C.*, et al., 7:20-cv-01959 (KMK)(JCM) (E.D.N.Y.), the plaintiff-insurers alleged that Defendant Kanter, a non-party in that action, was a treating provider at a fraudulently incorporated No-fault Clinic whose illegal lay-owners defrauded Plaintiffs out of more than $2 million by, among other things, providing medically unnecessary treatments and tests to patients and then seeking payment for such treatments and tests that were excessive, medically unnecessary, and, in some cases, never even provided. *Id.*, ECF No. 59 at ¶¶ 2, 315-19.

8.      In fact, James Spina, Jeffrey Spina, and Andrea Grossman (not named as Defendants in this Complaint), the architects of the fraudulent billing scheme underlying *Allstate Insurance Co., et al. v. James A. Spina II, D.C., et al.,* 7:20-cv-01959 (KMK)(JCM) (E.D.N.Y), pleaded guilty to conspiracy to commit healthcare fraud in connection to the fraudulent scheme alleged in the civil action . *See United States v. Spina, et al,* 18-cr-625 (KMK) (S.D.N.Y.)

9. On information and belief, following the example of the fraudulent billing scheme alleged in *Allstate Insurance Co., et al. v. James A. Spina II, D.C., et al.*, (7:20-cv-01959-KMK-JCM), Defendants Kanter presided over massive billing fraud operations at the Richmond Hill Clinic by routinely submitting to insurers, in general, and Allstate, in particular, claims for reimbursement for services that were devoid of any diagnostic or treatment value, and reflected a pattern of billing for services that were medically unnecessary.

10. Nissenbaum also has a long history of engaging in schemes to defraud as alleged herein. By way of example and not limitation, in the seminal case in this district regarding the fraudulent billing of New York No-fault insurance carriers by fraudulently incorporated medical practices, *State Farm Mut. Auto. Ins. Co. v. Mallela*, *et al.*, (00-cv-4923-CPS), plaintiff-insurers alleged that Defendant Nissenbaum was one of a number of chiropractors and unlicensed persons who were the true fraudulent owners of one or more medical practices, which submitted fraudulent claims for reimbursement to State Farm among other No-fault insurance carriers. *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 2002 WL 31946762, at *1, 5 (E.D.N.Y., 2002).

11. Moreover, the Fraudulent Providers located the Richmond Hill Clinic at a property owned by another individual with a long history of engaging in schemes to defraud No-fault insurance carriers. According to New York City property records, the site of the Richmond Hill Clinic is owned by Bonis Realty Corp. (not named a defendant in the Complaint), a domestic corporation organized in New York, which is owned by George J. Bonetti (not named a defendant in the Complaint).

12. George J. Bonetti shared a long history of engaging in schemes to defraud No-fault insurers, having been a co-defendant of Nissenbaum in *State Farm Mut. Auto. Ins. Co. v. Mallela*, *et al.*, (00-cv-4923-CPS), having also been alleged to be among the chiropractors and

unlicensed persons who were the true fraudulent owners of one or more medical practices, which submitted fraudulent claims for reimbursement to State Farm among other No-fault insurance carriers. *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 2002 WL 31946762, at *1, 5 (E.D.N.Y., 2002).

13.    In furtherance of their scheme to defraud, Defendants concocted and/or participated in a sophisticated fraudulent billing and medical documentation scheme that created the impression that Covered Persons had serious injuries and medical conditions that required, among other things, the Fraudulent Treatment Protocol, when in fact no such injuries and/or conditions existed.

14.    Covered Persons' initial consultations and follow-up visits at the Richmond Hill Clinic created and maintained the illusion of serious injuries, a misrepresented fact that was used to justify further consultations, testing, treatment, and referrals to other related providers operating out of the Richmond Hill Clinic at which the Defendant PCs purportedly provided services. By the conclusion of their treatment, many Covered Persons would receive examinations and unwarranted referrals for, among other things, chiropractic services, physical therapy, and diagnostic testing, virtually identical to other Covered Persons presenting at the same clinic.

15.    In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure, and protocol, one or more of the Defendants also billed Plaintiffs for unnecessary diagnostic tests, including computerized range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), nerve conduction velocity tests ("NCVs"), and electromyography tests ("EMGs") (collectively "Diagnostic Testing").

16.    By submitting fictitious bills and reports for Diagnostic Testing, Defendants misrepresented the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

17.    Once Covered Persons were directed or steered to the Defendant PCs, Defendants billed No-fault insurers, in general, and Plaintiffs, in particular, for medical services, including but not limited to chiropractic services, physical therapy, and diagnostic testing, purportedly rendered to the Covered Persons.

18.    At all relevant times mentioned herein, the Defendants knew or should have known that the Covered Persons who were directed and/or steered to the Defendant PCs would be used to obtain payment from insurers in general, and Plaintiffs in particular, in connection with fraudulent claims.

19.    At all relevant times mentioned herein, Defendants knew that the Covered Persons were directed for treatment and/or testing pursuant to a predetermined medical protocol, irrespective of medical necessity, that resulted from the financial arrangement or referral scheme they negotiated amongst themselves and/or with one or more John Does 1 through 20 and ABC Corporations 1 through 20.

20.    Because the Covered Persons purportedly treated by the Defendant PCs had been directed and/or steered for services as a result of an unlawful referral scheme for treatment and/or testing pursuant to a predetermined medical protocol, irrespective of medical necessity, any bills submitted to Plaintiffs for such services were fraudulent and, as such, never eligible for reimbursement.

21.    The No-fault Law is a statutory creation, in derogation of the common law, and must be strictly construed.  This lawsuit seeks to, among other things, enforce the plain language

of the No-fault Law and the implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits for properly performed, medically necessary treatment of Covered Persons injured in automobile accidents.  In doing so, Plaintiffs seek compensatory damages and declaratory judgments that Plaintiffs are not required to pay any No-fault claims from the Defendant PCs that seek reimbursement for any medical and/or other healthcare services or goods that are the result of a (1) fraudulent predetermined treatment protocol carried out irrespective of medical necessity; and/or (2) from an unlawful kickback and/or referral scheme.

22.     Such claims continue to be the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus constitute a continuing harm to Plaintiffs.

23.     By way of example and not limitation, Exhibits "1", "2", and "3" in the accompanying Compendium of Exhibits are representative samples of claims paid by Plaintiffs to Defendants Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, respectively, submitted for services provided pursuant to a protocol of treatment, never rendered, not of any diagnostic or treatment value and/or reflecting a pattern of billing for services that were medically unnecessary; and Exhibits "4", "5", and "6" in the accompanying Compendium of Exhibits are representative samples of such claims submitted by Defendants Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, respectfully, comprising of the, in excess of $1,100,000.00 in unpaid claims submitted by the Defendant PCs that form the basis of Plaintiffs' request for declaratory relief.

24.     Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Defendants, holding themselves out as being legitimate healthcare providers when, in fact, they were not.

25.     The practices alleged herein were conducted willfully, with the sole object of converting money, in utter disregard of their impact on the premium-paying public and in flagrant disregard of the rules and laws governing provision of services under the No-fault Law.

26.     The duration, scope and nature of all Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies.  Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—they adopted a fraudulent blueprint as their business plan, and used it to participate in a systematic pattern of racketeering activity.  Every facet of Defendants' operations, from generating fraudulent supporting medical documents to record keeping to billing, was carried out for the purpose of committing fraud.

## NATURE OF THE ACTION

27.     This action is brought pursuant to:

   i)   The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), 1962(d) and 1964(c);

   ii)  New York state common law; and

   iii) The Federal Declaratory Judgment Act; 28 U.S.C. §§ 2201, 2202.

## NATURE OF RELIEF SOUGHT

28.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and the Defendants' acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for medical services they allegedly rendered to individuals covered by Plaintiffs under New York State's No-fault Law.

29.     Plaintiffs seek compensatory damages to recover all payments made to the Defendant PCs during the time periods alleged herein as a result of Defendants fraudulently obtaining payments from Plaintiffs for purported medical and/or other healthcare services

rendered following to a fraudulent predetermine treatment protocol, pursuant to unlawful referral schemes involving exchanges of kickbacks and/or other financial compensation, which were medically unnecessary and of no diagnostic or treatment value, to individuals covered by Plaintiffs under New York State's No-fault Law.

30.    Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

31.    Plaintiffs seek a judgment declaring:

a.    That Plaintiffs are under no obligation to pay any of the Defendant PC's No-fault claims arising from any examination, testing, or treatment of, or services allegedly provided to, Covered Persons because of Defendants' fraudulent, unlawful and deceptive scheme to induce such payments as alleged herein;

b.    That Plaintiffs are under no obligation to pay any of the Defendant PC's No-fault claims because they have engaged in an illegal fraudulent predetermined protocol of treatment carried out irrespective of medical necessity for the sole purpose of enriching the Defendants; and

c.    That Plaintiffs are under no obligation to pay any of the Defendant PC's No-fault claims because they have engaged in unlawful referral and/or kickback arrangements in violation of New York state law, and therefore not entitled to recover benefits under the No-fault Law and implementing regulations.

32.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $2,900,000.00, the exact amount to be determined at trial, in payments which Defendants received for billing Plaintiffs for purported medical and/or other healthcare services provided (i) pursuant to a fraudulent predetermined treatment protocol without regard to each Covered Person's individualized physical condition; (ii) pursuant to an illegal referral scheme, kickback scheme, and/or other financial arrangement, and/or (iii) despite being medically unnecessary and of no diagnostic or treatment value.

## THE PARTIES

**A.     Plaintiffs**

33.     Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

34.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

35.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

36.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

37.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York state law.

**B.     Fraudulent Providers**

38.     Defendant Miriam E. Kanter, M.D. ("Kanter") is a natural person residing in the State of New York and was licensed to practice medicine in the State of New York on or about June 15, 1994 under license number 196026, and is listed with the Departments of State and Education as the sole owner of Kanter Physical Medicine & Rehab, P.C. and Miriam Kanter, M.D., P.C. In furtherance of the schemes to defraud alleged herein, Kanter's services were billed to Allstate through Kanter Physical Medicine & Rehab, P.C. and Miriam Kanter, M.D., P.C.

39.    At all relevant times mentioned herein, Defendant Kanter knowingly participated in the scheme to defraud, including, but not limited to billing for services that were not medically necessary and/or of no diagnostic or treatment value and purportedly provided pursuant to a predetermined treatment protocol irrespective of each Covered Person's individualized physical condition as part of unlawful referral schemes involving exchanges of kickbacks and/or other financial compensation, and employing the Defendants' office personnel to prepare bills submitted to Plaintiffs for services that were the result of unlawful referral schemes involving exchanges of kickbacks and/or other financial compensation.

40.    Defendant Steven R. Nissenbaum, D.C. ("Nissenbaum") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 002059, issued by the New York State Education Department on or about January 13, 1978.  Defendant Nissenbaum is listed with the Departments of State and Education as the sole owner of Chiropractic Associates of Richmond Hill P.C. and is the owner on paper of that professional corporation. In furtherance of the schemes to defraud alleged herein, Nissenbaum's services were billed to Allstate through Chiropractic Associates of Richmond Hill P.C.

41.    At all relevant times mentioned herein, Defendant Nissenbaum knowingly participated in the scheme to defraud, including, but not limited to, billing for services that were not medically necessary and/or of no diagnostic or treatment value and purportedly provided pursuant to a predetermined treatment protocol irrespective of each Covered Person's individualized physical condition as part of unlawful referral scheme involving exchanges of kickbacks and/or other financial compensation, and employing the Defendants'

11

office personnel to prepare bills submitted to Plaintiffs for services that were the result of an unlawful referral scheme involving exchanges of kickbacks and/or other financial compensation.

### C.    Defendant PCs

42.    Defendant Chiropractic Associates of Richmond Hill P.C. ("Chiropractic Associates of RH") was incorporated on or about September 18, 1990, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  At all relevant times mentioned herein, Defendant Nissenbaum fraudulently billed Plaintiffs for chiropractic services, through Chiropractic Associates of RH, purportedly provided by Chiropractic Associates of RH to Covered Persons presenting for treatment at the Richmond Hill Clinic pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity as part of an unlawful referral scheme involving exchanges of kickbacks and/or other financial compensation.

43.    Defendant Kanter Physical Medicine & Rehab, P.C. ("Kanter Physical Medicine & Rehab") was incorporated on or about April 17, 2012, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.  Defendant Kanter fraudulently billed Plaintiffs for medical and other healthcare services, through Kanter Physical Medicine & Rehab, purportedly provided by Kanter Physical Medicine & Rehab pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity as part of an unlawful referral scheme involving exchanges of kickbacks and/or other financial compensation.

44.    Defendant Miriam Kanter, M.D., P.C. ("Miriam Kanter MD Practice") was incorporated on or about August 22, 2001, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located in New York.

Defendant Kanter fraudulently billed Plaintiffs for medical and other healthcare services, through Miriam Kanter MD Practice, purportedly provided by Miriam Kanter MD Practice pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity as part of an unlawful referral scheme involving exchanges of kickbacks and/or other financial compensation.

### D.    John Doe and ABC Corporation Defendants

45.    On information and belief, John Does 1 through 20 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

46.    On information and belief, the ABC Corporations 1 through 20 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of John Does 1 through 20, which were used in connection with the unlawful referrals/kickback scheme in furtherance of the overarching scheme to defraud. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

### JURISDICTION AND VENUE

47.    The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

48.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

49.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

50.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

51.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

52.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

53.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law (popularly known as the "No-fault Law") §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

54.     Each of the Defendant PCs are ostensibly healthcare providers that bill for treatments to , among others, individuals covered under the No-fault Law. In exchange for their services, the Defendant PCs accept assignments of benefits from their Covered Persons and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

14

55.    In purported compliance with the No-fault Law and 11 N.Y.C.R.R. § 65, et seq., the Defendant PCs, submitted proof of their claims to Plaintiffs, using the claim form prescribed by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" (or "NF-3" form)).

56.    Pursuant to Section 403 of the New York Insurance Law, the claim forms submitted to Plaintiffs by the Defendant PCs, contained the following warning at the foot of the page:

> "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

57.    To process and verify claims submitted by the Defendant PCs, Plaintiffs required, and the Defendant PC's submitted, to the extent applicable, narrative reports and other medical records relative to the alleged medical care and treatment rendered to Covered Persons, for which the Defendant PCs were seeking payment from Plaintiffs.

58.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process claims for which a PC has standing to submit, within 30 days of receipt of proof of claim.

59.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and paid Defendants based on the representations and information that Defendants mailed to Plaintiffs.

60.    In addition, under New York law, it is unlawful for any licensed healthcare professional to exercise undue influence on a patient, including the promotion or the sale of

goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party. *See* N.Y. Education Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

61.     Moreover, section 6530(18) of New York's Education Law prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services…" N.Y. Educ. Law § 6530(18), (19); *see also* 8 NYCRR § 29.1(b)(3), (4). Thus The payment by a healthcare practitioner or professional corporation to another party for the referral of a patient is a practice prohibited by New York State Law.

62.     Notwithstanding the foregoing, to maximize profits, the Fraudulent Providers, through their respective Defendant PCs, engaged in a massive scheme to defraud, submitted bills to Plaintiffs for services, including but not limited to initial and follow-up exams, chiropractic examinations and treatment, physical therapy treatments, various diagnostic tests, and pain management injections and related services, purportedly provided to virtually every patient which presented at the Richmond Hill Clinic pursuant to a protocol of fraudulent treatment, irrespective of medical necessity.

63.     In furtherance of the scheme to defraud alleged herein, the Fraudulent Providers, ordered, performed, and/or caused to be performed, for their economic benefit, initial and follow-up exams, chiropractic examinations and treatments, physical therapy treatments, electrodiagnostic testing, computerized range of motion and muscle testing, and pain management injections, and submitted medical records, reports and bills to Plaintiffs, wherein they falsely represented that the billed for services: (i) were performed as billed; (ii) were performed in accordance with standard of care for such services; (iii) were ordered as a result of

legitimate diagnoses following properly performed initial and/or follow-up evaluations; (iv) yielded medically valid diagnoses; and/or (v) were medically necessary.

64.     At all relevant times mentioned herein, the Defendant PCs were illegal enterprises that engaged in systematic and pervasive fraudulent practices.

65.     Defendants were part of well-organized illegal enterprises that engaged in systematic and fraudulent practices that distinguished them from legitimate healthcare providers as follows:

- Unlike legitimate providers, the Defendant PCs misrepresented the existence or severity of any injuries that Covered Persons may have had and the course of any treatments;

- Unlike legitimate providers, the Defendant PCs routinely submitted claims for services pursuant to the Fraudulent Treatment Protocol that were medically unnecessary and/or performed in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services;

- Unlike legitimate providers, the Defendant PCs submitted claims for services pursuant to the Fraudulent Treatment Protocol established by the Fraudulent Providers and/or one or more John Doe Defendants;

- Unlike legitimate providers, rather than perform valid tests according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Defendant PCs performed invalid, medically unnecessary and bogus diagnostic tests that willfully misrepresented medical facts and potentially endangered the Covered Persons;

- Unlike legitimate providers, the Defendant PCs routinely fabricated and submitted fraudulent documentation to Plaintiffs for payment which contained material misrepresentations and/or reflected billing for services that were never rendered and/or not rendered as billed;

- Unlike legitimate providers, the Defendant PCs submitted claims for services pursuant to a predetermined course of treatment as part of an unlawful referral scheme. kickback scheme or other financial arrangement; and

- Unlike legitimate providers, the Defendant PCs submitted bills, using the prescribed "NF-3" forms wherein Defendants knowingly, with intent to deceive Allstate and induce payment as a result thereof, and falsely

17

misrepresented the services reflected therein, when in fact the services were of no diagnostic or treatment value.

66.     In these and numerous other ways, the Fraudulent Providers, through the Defendant PCs, sought to deceive Plaintiffs into paying fraudulent claims that, in total, exceeded thousands of dollars per patient.

67.     At all relevant times mentioned herein, the Fraudulent Providers knew or should have known that the Fraudulent Treatment Protocol for which the Defendant PCs billed Plaintiffs were not performed as billed, were fabricated, were of no diagnostic value and/or were provided pursuant to a pre-determined fraudulent protocol, irrespective of medical necessity.

68.     At all relevant times mentioned herein, the Fraudulent Providers, through the Defendant PCs, directly or through others acting under and pursuant to their directions, instructions and control, submitted or caused to be submitted fraudulent bills for the Fraudulent Treatment Protocol, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

## MECHANICS OF THE SCHEME TO DEFRAUD

69.     In furtherance of the scheme to defraud alleged herein, individuals who were purportedly involved in automobile accidents in New York and purportedly sustained soft-tissue injuries would present to the Richmond Hill Clinic, which would automatically trigger a treatment protocol designed to fraudulently bill insurance companies, in general, and Allstate, in particular, for *inter alia,* medical evaluations, diagnostic tests, pain management injections, chiropractic treatment, and physical therapy, irrespective of medical necessity.

70.     To the extent any Covered Person was examined at all by the providers operating out of the Richmond Hill Clinic, each was diagnosed with conditions that varied little from

Covered Person to Covered Person, allowing for the same predetermined protocol of treatment for each Covered Person.

71.    Notwithstanding that legitimate treatment plans for patients with non-specific neck and back pain, such as those purportedly treated at the Richmond Hill Clinic, may be limited to rest, over-the-counter pain medications, and application of heat or cold packs, or involve no treatment at all, Covered Persons purportedly treated at the Richmond Hill Clinic were routinely assessed the same general diagnoses and subjected to the same pre-determined treatment protocol irrespective of medical necessity, including but not limited to diagnostic testing purportedly provided by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice; physical therapy services purportedly provided by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice; chiropractic services purportedly provided by Chiropractic Associates of RH; and pain management injections purportedly provided by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice.

72.    The protocol of treatment by each of the providers operating out of the Richmond Hill Clinic involved virtually the same services purportedly performed for nearly every Covered Person on each visit and continued irrespective of any documented changes in the Covered Person's condition.

73.    On information and belief, the protocol of treatment by each of the providers operating out of the Richmond Hill Clinic failed to take into account the needs of any particular Covered Person, and rarely, if ever, varied based upon a Covered Person's age, medical history, circumstances of alleged accident, physical condition, symptoms, prior treatment or severity or location of alleged injury and/or the treatment provided was medically unnecessary, improperly performed, and/or was of diagnostic and/or treatment value.

74.    Rather than taking into account the needs of individual Covered Persons, Defendants implemented and/or participated in a fraudulent treatment apparatus through which they, as a matter of pattern, practice and protocol, provided Covered Persons with, and billed Allstate for, among other things, initial and follow-up examinations, electrodiagnostic testing, computerized range of motion and manual muscle testing, chiropractic services, physical therapy treatment, and pain management injections, irrespective of medical necessity (the "Fraudulent Treatment Protocol").

75.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault claimants would receive the same course of treatment, typically consisting of physical therapy and chiropractic services, as well as NCVs, EMGs, ROM Tests and Muscle Tests, and pain management injections, pursuant to a standard treatment protocol regardless of whether such treatment was medically necessary.

### 1.    The Fraudulent Initial Examinations

76.    In furtherance of the scheme to defraud alleged herein, Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely performed initial evaluations on Covered Persons for no other reason than to justify the referral of Covered Persons for additional services at the Defendant PCs and/or other healthcare providers operating at or in conjunction with the Richmond Hill Clinic.

77.    On information and belief, the initial evaluations purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice were not reimbursable pursuant to the No-fault Law because they were (i) medically unnecessary; (ii) performed pursuant to an illegal referral and kickback arrangement; and/or (iii) performed pursuant to a fraudulent treatment protocol irrespective of individualized need.

78.    On information and belief, the initial evaluations purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely misrepresented the severity of Covered Persons' injuries in order to justify the ordering of additional services and/or referral of Covered Persons for such at the Defendant PCs and/or other healthcare providers operating at or in conjunction with the Richmond Hill Clinic.

79.    On information and belief, in addition to billing for medically unnecessary initial evaluations, Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely billed Plaintiffs for Covered Persons' initial evaluations pursuant to CPT Codes 99204 and/or 99205, notwithstanding that such initial evaluations, if performed at all, were not reimbursable pursuant to such codes.

80.    The American Medical Association (AMA) is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

81.    Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the charges for professional health services that are reimbursable under the No-fault Law. The Fee Schedule incorporates the CPT Codes published by the AMA, and the coding rules and regulations set forth by the AMA (collectively the "AMA Guidelines").

82.    There are five possible CPT Codes (99201-99205) for an initial office visit. The level of the billing code that is used has to reflect three factors: the history taking, the examination, and the level of medical decision making.

83.     On information and belief, CPT Code 99204 may be used to bill for the evaluation and management of a new patient which requires three key components: a comprehensive history, a comprehensive examination, and medical decision making of moderate complexity. Typically, 45 minutes are spent face-to-face with the patient and/or family during an examination billed under CPT Code 99204.

84.     On information and belief, CPT Code 99205 may be used to bill for the evaluation and management of a new patient which requires three key components: a comprehensive history, a comprehensive examination, and medical decision making of high complexity. Typically, 60 minutes are spent face-to-face with the patient and/or family during an examination billed under CPT Code 99205.

85.     On information and belief, the American Medical Association's CPT Assistant, which is incorporated into the Fee Schedule by reference, defines comprehensive history as: Chief complaint; extended history of present illness; review of systems that are directly related to the problem(s) identified in the history of the present illness plus a review of all additional body systems; complete past, family, and social history.

86.      On information and belief, the CPT Assistant lists fourteen (14)  body systems that have to be reviewed and documented for a comprehensive history, including (i) constitutional symptoms; (ii) eyes; (iii) ears, nose, mouth, throat; (iv) cardiovascular; (v) respiratory; (vi) gastrointestinal; (vii) genitourinary; (viii) musculoskeletal; (ix) integumentary (skin and/or breast); (x) neurological; (xi) psychiatric; (xii) endocrine; (xiii) hematologic/lymphatic; and (xiv) allergic/immunologic.

87.     On information and belief, in furtherance of the scheme to defraud Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, billed Plaintiffs for Covered

22

Persons' initial evaluations using CPT Codes 99204 and/or 99205, notwithstanding that the Defendant PCs never performed or documented a comprehensive history for such persons, and such evaluations were billable, if at all, pursuant to CPT Code 99203 which has a lower reimbursement rate than CPT Codes 99204 or 99205.

88.    By billing Plaintiffs for initial evaluations pursuant to CPT Code 99204 and/or 99205, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, falsely represented that they performed comprehensive initial evaluations on Covered Persons, when in fact no such evaluations were performed.

89.    On information and belief, in addition to falsely representing (by billing pursuant to CPT Codes 99204 or 99205) that they performed comprehensive evaluations on Covered Persons, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, falsely represented that their evaluations of Covered Persons involved medical decision-making of either a "moderate complexity level" or a "high complexity level" as required for billing an initial evaluation under CPT Codes 99204 and 99205, respectively, when in fact, it did not.

90.    On information and belief, as stated in the CPT Assistant, medical decision making refers to the complexity of establishing a diagnosis and/or selecting a management option as measured by: (i) the number of possible diagnoses and/or the number of management options that must be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed and analyzed; and (iii) the risk of significant complications, morbidity and/or mortality, as well as co-morbidities associated with the patient's presenting problem(s), the diagnostic procedure(s) and/or the possible management options.

91.    In addition, the physician must consider the number of possible diagnoses and the number of management options related to that specific encounter and also consider how much data there is to be reviewed at that specific encounter. Only the data/records/information being considered at that encounter are factored into the type of decision making performed that day. Similarly, the risk of significant complications, morbidity and/or mortality, as well as co-morbidities associated with the patient's presenting problem(s), the diagnostic procedure(s) and/or the possible management options relate only to the encounter being coded.

92.    On information and belief, to the extent that any Covered Person complained of injuries at initial evaluations, such Covered Persons complained mainly of neck and/or low back pain, were ambulatory, and were being seen by appointment as outpatients and not on an emergency basis, and any related decision-making was, if anything, straight forward or, at most, of low complexity.

93.    By way of example and not limitation as to how the initial evaluations, purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not involve medical decision making of moderate or high complexity, the practitioner purportedly performing initial evaluations on behalf of Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not review data, test reports or medical records, nor did they ever request medical records from other medical providers prior to the initial evaluations of Covered Persons.

94.    By way of further example and not limitation as to how the initial evaluations purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not involve medical decision making of moderate or high complexity, the Covered Persons who were purportedly evaluated did not have any risk of significant complications or morbidity

24

or mortality due to the minor injuries they purportedly suffered, nor did the practitioners purportedly performing initial evaluations on behalf Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice consider any significant number of diagnoses or treatment options for the Covered Persons during the initial examinations.

95.     On information and belief, to the extent that Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice performed initial evaluations, they involved a protocol evaluation and treatment plan in furtherance of the scheme to defraud alleged herein.

96.     On information and belief, demonstrative of the fact that the initial evaluations purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice were fraudulent and did not involve decision making of moderate or high complexity, virtually every Covered Person who purportedly had an initial evaluation was prescribed the same protocol set list of treatments.

97.     On information and belief, because the initial evaluations purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not involve comprehensive evaluations of Covered Persons or medical decision-making of moderate or high complexity, the only other way they could properly bill Plaintiffs pursuant to CPT Code 99204 or 99205 is if more than 50% of the face-to-face time spent with the patient was for counseling/coordination (and the total time spent was at least 45 minutes or at least 60 minutes, respectively).

98.     On information and belief, the Defendants routinely billed Plaintiffs for straight forward and/or low complexity initial evaluations pursuant to CPT Codes 99204 and/or 99205 notwithstanding that 50% or more of the face-to-face time spent was not spent with Covered Persons.

99.    By way of example but not limitation, Exhibit "7" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative example of claims where Defendants Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice billed Plaintiffs for comprehensive initial evaluations or evaluations requiring medical decision-making of moderate or high complexity on Covered Persons and/or evaluations where more than 50% of the face-to-face time spent with the Covered Person was for counseling/coordination, which were not performed.

100.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0657524518-03; 0574471181-02; 0559763346-01; 0523652196-01; 0503934937-02; 0486144868-01; 0254719446-02; 0252161468-05; 0252161468-01; 0251286258-03; 0251286258-01; 0246309827-03; 0192564946-01; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for initial evaluations billed under codes 99204 and/or 99205, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

**2.    The Fraudulent Follow-up Examinations**

101.    In furtherance of the scheme to defraud alleged herein Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely performed a series of medically unnecessary follow-up evaluations on Covered Persons for no other reason than to justify the continuation of referred medical and other healthcare services for Covered Persons following the

fraudulent initial evaluations, as well as new referrals for additional services at the Defendant PCs and/or other healthcare providers operating at or in conjunction with the Richmond Hill Clinic.

102. On information and belief, in addition to billing for medically unnecessary initial evaluations, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely billed Plaintiffs for Covered Persons' follow-up evaluations pursuant to CPT Code 99214, notwithstanding that such follow-up evaluations, if performed at all, were not reimbursable pursuant CPT Code 99214.

103. There are five possible CPT Codes (99211-99215) for a follow-up office visit. Like the CPT Codes for initial evaluations, the level of the billing code is defined by three factors: the history taking, the examination, and the level of medical decision making, however, they differ from the codes for the initial visits in that only two of the criteria need to be met.

104. On information and belief, CPT Code 99214 may be used to bill for the evaluation and management of an established patient which requires at least two of three key components: a detailed history, a detailed examination, and medical decision making of moderate complexity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

105. In furtherance of the scheme to defraud, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice billed Plaintiffs for Covered Persons' follow-up evaluations using CPT Code 99214, notwithstanding that histories taken and physical exams performed were problem focused, rather than detailed, as required by CPT Code 99214, and the decision making was straight forward, or at best of low complexity, rather than moderate complexity as required by CPT Code 99214.

106. Accordingly, based on the recorded history, exam, and lack of complexity in medical decision making, the follow-up evaluations billed for by Defendants Kanter Physical

27

Medicine & Rehab and Miriam Kanter MD Practice, to the extent they were performed at all, were billable, if at all, pursuant to CPT Code 99213 which has a lower reimbursement rate than CPT Code 99214.

107.   On information and belief, because the follow-up evaluations purportedly performed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not involve comprehensive evaluations of Covered Persons or medical decision-making of moderate-complexity, the only other way that they could properly bill Plaintiffs pursuant to CPT Code 99214 is if more than 50% of the face-to-face time spent with the patient was for counseling/coordination (and the total time spent with the patient was at least 25 minutes).

108.   On information and belief, the Defendants routinely billed Plaintiffs for straight forward and/or low complexity follow-up evaluations pursuant to CPT Code 99214, notwithstanding that 50% or more of the face-to-face time spent was not spent with Covered Persons.

109.   Finally, demonstrative of the fact that the follow-up evaluations purportedly performed Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice were fraudulent, the treatment plan following each follow-up report routinely stayed the same regardless of whether the Covered Person's condition was improving.

110.   By way of example but not limitation, Exhibit "8" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative example of claims where Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice billed Plaintiffs for comprehensive follow-up evaluations or evaluations requiring medical decision-making of moderate complexity on Covered Persons and/or evaluations where more than 50% of the face-to-face time spent with the patient was for counseling/coordination, which were not performed.

111.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0507658706-02; 0503934937-02; 0300845468-02; 0280928185-02; 0274579754-03; 0228566410-04; 0219911897-01; 0215431016-08; 0192564946-01; 0181220962-04; 0172222127-03; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for follow-up evaluations billed under codes 99214 and/or 99215, that that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

### 3.    The Fraudulent Electrodiagnostic Testing

112.    In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice billed Allstate for electrodiagnostic testing when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

113.    The electrodiagnostic testing was purportedly performed, if at all, in a manner that Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice knew or should have known was contrary to the prevailing standard of care and would produce invalid data, findings and diagnoses that endangered the welfare of the Covered Persons, putting them at risk of having undiagnosed medical conditions and diseases and/or the wrong diagnosis and wrong treatment.

114.    By submitting fictitious bills and reports for electrodiagnostic testing to Allstate, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice misrepresented

the actual medical status of the Covered Persons and the services purportedly rendered, which were not provided as billed, if provided at all.

115.    The American Medical Association (AMA) is the publisher of the CPT Code Book, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

116.    Pursuant to Section 5108 of the Insurance Law, the Department of Insurance has adopted the Fee Schedule published by the Workers' Compensation Board, which sets forth the charges for professional health services that are reimbursable under the No-fault Law. The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA (collectively the "AMA Guidelines).

117.    At all relevant times mentioned herein, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted bills to Allstate for electrodiagnostic tests, wherein using CPT codes that intentionally and materially misrepresented the services, if any, performed and for which they sought reimbursement and were paid.

118.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely referred Covered Persons treated at the Richmond Hill Clinic for evaluations billed through the Richmond Hill Clinic that Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice knew or should have known were medically unnecessary and/or would produce medically invalid recommendations for electrodiagnostic testing, also billed through the Richmond Hill Clinic, that were of no clinical or diagnostic value.

119.    In furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted boilerplate reports of purported evaluations to falsely justify electrodiagnostic testing which was not indicated by the Covered Persons' examination findings.

120.    The nervous system is divided into two major anatomical divisions: the central nervous system and the peripheral nervous system. The central nervous system includes the brain and the spinal cord, while the peripheral nervous system includes the peripheral nerves. The purpose of a neurological examination is to identify the presence of any abnormality in the nervous system. The standard neurological examination checks the function and integrity of each component of the nervous system, including examination for the presence of generalized diseases of the peripheral nerves, known as neuropathy. Neuropathy can result from many diseases such as diabetes, kidney failure, cancer, AIDs and from systemic inflammatory disease of the small arteries of the body. In accordance with accepted medical practice, when a physician conducts an examination of a patient where the complained of symptoms may affect the nervous system or where the examination shows findings suggestive of nervous system disease or injury, it is essential that the physician rule out the existence of neuropathy, which can, for most patients, be accomplished utilizing simple neurological tests including but not limited to testing the patient's reflexes, pinprick sensation, vibration sensation, proprioceptive sensation, and muscle strength, with the performance of an NCV needed in only a minority of cases.

121.    Radiculopathy is defined as injury or dysfunction of spinal nerve roots, which may affect the nerve root of a sensory nerve, motor nerve or both. With respect to trauma cases, such as those suffered as a result of automobile accidents, for the few cases in which radiculopathy occurs, the usual cause of radiculopathy is direct pressure on the nerve root by a

herniated intervertebral disc causing inflammation of the nerve root. In the context of electrodiagnostic testing, for most patients the presence or absence of radiculopathy can be determined by neurological examination, with EMG performed to find and confirm radiculopathy in the minority of cases in which the neurological examination is not definitive.

122.    On information and belief, to confirm or rule out a diagnosis through an NCV and EMG, the data and results produced from the testing must be performed and interpreted in a medically valid manner according to the standard of practice. Similarly, it is impossible to correctly interpret an EMG unless the NCV is properly performed and interpreted in accordance with the prevailing standard of practice.

123.    On information and belief, in numerous instances, the reported results associated with the electrodiagnostic testing performed by or through Defendants were fictitious, meaning that Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely and as an integral element of their scheme to defraud submitted bogus reports, findings and data to insurance companies, in general, and Plaintiffs, in particular, to substantiate their fraudulent claims and induce payment.

### a) Misrepresentation of Electrodiagnostic Findings and Diagnoses

### i.    Over-Diagnosis of Radiculopathy

124.    Accepted medical literature and published studies have determined that the rate of radiculopathy confirmed by EMG testing typically seen in patients who have been involved in motor vehicular accidents, such as those purportedly treated by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, is in the range of 8% for cervical radiculopathy, 12% for lumbar radiculopathy, and 19% for either cervical or lumbar radiculopathy. *See, e.g.,* Braddom

RL, Spitz L and Rivner MH. Frequency of Radiculopathies in Motor Vehicle Accidents. *Muscle & Nerve,* 39: 545-547, 2009.

125.    Contrary to published reports and medically accepted rates concerning patients diagnosed with radiculopathy post motor vehicle accident, a representative review of 36 patient files submitted by Defendants to Plaintiffs for reimbursement of electrodiagnostic testing consisting of 52 studies, reveals that Defendants diagnosed cervical radiculopathy and/or lumbosacral radiculopathy in 37 studies (71%) from 29 patients (81%). By way of example and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a table identifying the patients with radiculopathy diagnoses in the sampled claim files.

126.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers  0645173873-04;  636237349-01;  0607588654-05;  0580990679-01;  0580188001-02; 0556981496-01; 0535100036-02; 0192564946-01; 0181220962-04; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing purporting to diagnose radiculopathy, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

127.    The differences in the frequency of radiculopathy diagnoses between what is typically found in ambulatory post-motor vehicle accident patients and the radiculopathy rate purportedly found by Defendants is strongly indicative of fraud and an intentional misrepresentation of the electrodiagnostic testing for which Defendants billed Plaintiffs. This

consistent over-diagnosis of cervical and lumbar radiculopathy demonstrates that the electrodiagnostic testing was either not performed as billed, was fabricated, and/or was of no diagnostic value. Moreover, the false diagnosis of radiculopathy by Defendants reflects a disregard for the welfare of the patients since the wrong diagnosis could result in selection of the wrong treatment plan.

### ii.    Over-Diagnosis of Multi-Level Radiculopathy

128.    Accepted medical literature and published studies have determined that the majority of radiculopathies occur at only one level, and that single root level involvement can be diagnosed by clinical means 75%-80% of the time. *See, e.g.*, Dumitru, *Electrodiagnostic Medicine.* (1st Ed., Hanley and Belfus, Philadelphia, 1995, p. 557).

129.    Contrary to the medically accepted literature regarding single root level radiculopathy, a review of the 36 patient files submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Plaintiffs for reimbursement of electrodiagnostic testing, in which 37 studies in 29 patient files purported to record diagnoses of radiculopathy where Covered Persons purportedly underwent EMG testing, Defendants diagnosed multi-level radiculopathy in 16 out of 37 studies (43%), from 12 of the 29 patients (41%). By way of example and not limitation, Exhibit "10" in the accompanying Compendium of Exhibits is a table identifying diagnoses of multi-level radiculopathy in the sampled claim files.

130.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0645173873-04; 0636237349-01; 0192564946-01; 0181220962-04; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing

purporting to diagnose multi-level radiculopathy, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

131.    The consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in such numbers despite the medically accepted standard that the vast majority of those studies should have yielded a single-root diagnosis, demonstrates that the electrodiagnostic testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

132.    The consistent over-diagnosis of multi-level radiculopathy, finding multi-level radiculopathy in such numbers despite the medically accepted standard that the vast majority of those studies should have yielded a single-root diagnosis, demonstrates Defendants' disregard for the welfare of the patients and could result in the subsequent selection of improper and unnecessary invasive treatments by other providers that might rely on these diagnoses.

### iii.    Over-Diagnosis of Bilateral Radiculopathy

133.    Accepted medical literature and published studies have determined that only about 1%-6% of patients diagnosed with either cervical or lumbar radiculopathy suffer from bilateral radiculopathy.

134.    Accepted medical literature and published studies advise that bilateral radiculopathy is rarely caused by compressive injuries such as those experienced in motor vehicle accidents, but rather, indicates other conditions, including osteomyelitis, tuberculous meningitis, vertebrae metastasis, lymphoma, leptomeningeal carcinomatosis, sarcoidosis, spinal cord ischemia, and multiple sclerosis, and represents a need for further exploration by the treating physician in order to rule out more serious conditions.

135.    Contrary to the medically accepted literature regarding the infrequency of bilateral radiculopathy, a review of the 36 patient files submitted by Defendants to Plaintiffs for reimbursement of electrodiagnostic testing described above, in which 37 studies in 29 patient files purported to record diagnoses of radiculopathy where Covered Persons purportedly underwent EMG testing, Defendants diagnosed bilateral radiculopathy in 14 out of 29 patients (48%). By way of example and not limitation, the Covered Persons for which Defendants diagnosed bilateral radiculopathy are: D.R., claim number 0645173873-04; M.N., claim number 0636237349-01; V.R., claim number 0535100036-02; V.R., claim number 0389062563-01; B.I., claim number, 0300845468-02; P.R., claim number 0280928185-02; R.P., 0274579754-03; M.C., claim number 0219911897-01; A.S., 0192564946-01; G.A., 0181220962-04; M.S., 0180004541-03; R.B., claim number 0159765642-02, S.K., claim number 0156952236-03; and R.S., claim number 0142653096-03.

136.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0645173873-04; 0636237349-01; 0535100036-02; 0192564946-01; and 0181220962-04; in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing purporting to diagnose bilateral radiculopathy, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

137.    Defendants' over-diagnosis of bilateral radiculopathy, combined with their failure to follow-up and rule out more serious conditions, demonstrates that the electrodiagnostic testing was either not performed as billed, was fabricated, and/or was of no diagnostic value.

138.    On information and belief, Defendants' disregard for patient health in failing to investigate serious conditions could have resulted in the patients suffering permanent nerve or muscle damage or unchecked progression of an underlying disease with potentially serious or life-threatening consequences.

139.    Defendants did not investigate the potential existence of more serious medical and life-threatening conditions because they knew the results were the product of fraudulent electrodiagnostic testing and therefore it was unnecessary to rule out a serious underlying condition, or they willfully ignored such results, exhibiting a gross reckless indifference to the care and wellbeing of their patients.

### iv.    Over-Diagnosis of Carpal Tunnel Syndrome

140.    Accepted medical literature and published studies have determined that the rate of carpal tunnel syndrome confirmed by electrodiagnostic testing typically seen in patients who have been involved in motor vehicular accidents, such as those purportedly treated by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, is in the range of 21%. *See, e.g.,* Braddom RL, Spitz L and Rivner MH. Frequency of Radiculopathies in Motor Vehicle Accidents. *Muscle & Nerve,* 39: 545-547, 2009.

141.    Contrary to published reports and medically accepted rates concerning patients diagnosed with carpal tunnel syndrome post motor vehicle accident, a representative review of 36 patient files submitted by Defendants to Plaintiffs for reimbursement of electrodiagnostic testing consisting of 52 studies, reveals that Defendants diagnosed carpal tunnel syndrome in 16

of the 26 upper limb studies (62%) and in 16 of the 36 patients (44%). By way of example and not limitation, Exhibit "11" in the accompanying Compendium of Exhibits is a table identifying the patients with carpal tunnel syndrome diagnoses in the sampled claim files.

142.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers  0645173873-04;  0607588654-05;  0535100036-02;  0192564946-01;  0181220962-04; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing purporting to diagnose carpal tunnel syndrome, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

143.    The differences in the frequency of carpal tunnel syndrome diagnoses between what is typically found in ambulatory post-motor vehicle accident patients and the carpal tunnel syndrome rate purportedly found by Defendants is strongly indicative of fraud and an intentional misrepresentation of the electrodiagnostic testing for which Defendants billed Plaintiffs. This consistent over-diagnosis of carpal tunnel syndrome demonstrates that the electrodiagnostic testing was either not performed as billed, was fabricated, and/or was of no diagnostic value. Moreover, the false diagnosis of carpal tunnel syndrome by Defendants reflects a disregard for the welfare of the patients since the wrong diagnosis could result in selection of the wrong treatment plan.

**v.    Diagnoses Not Justified By Reported Findings**

144.    Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely made final diagnoses that could not be justified by the reported electrodiagnostic data, including but not limited to the provision of a final diagnosis that does not take into account or is contrary to H-reflex data; does not take into account the presence of conduction blocks; and/or is based on an insufficient number of limb muscles being studied; providing diagnoses that are not supported by the NCV studies/EMG findings.

145.    By way of example and not limitation, in a review of 52 electrodiagnostic studies purportedly performed by the Defendants, more than one third (18 of 52) of these studies clearly did not provide the well-supported diagnosis that was expected. By way of example and not limitation, Exhibit "12" in the accompanying Compendium of Exhibits is a table identifying sample claims where Defendants' diagnoses are not justified by the reported findings.

146.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0645173873-04; 0607588654-05; 0535100036-02; 0192564946-01; 0181220962-04; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing where Defendants' diagnoses are not justified by the reported findings, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

#### vi.    Failure to Take into Account Other Possible Pathologies

147.    Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely purportedly performed electrodiagnostic testing that demonstrated significant abnormal findings which the Defendants failed to document, address, explain or otherwise account for despite a medical professional purportedly interpreting the data and providing a final diagnosis on behalf of the Defendants.

148.    By way of example and not limitation, in a review of 52 electrodiagnostic studies purportedly performed by the Defendants, those providers failed to consider other diagnostic possibilities or pathologies in 46 of 52 (88%) of studies performed.

149.    The failure to document, address, explain or otherwise account for abnormal findings was evidenced by the providers' failure to give a diagnostic explanation for: 1) the presence of abnormal NCV study results; 2) the diagnoses of multilevel radiculopathy when a single level radiculopathy was more likely; and/or 3) the presence of undiagnosed conduction blocks. By way of example and not limitation, Exhibit "13" in the accompanying Compendium of Exhibits is a table identifying sample claim files where Defendants failed to take into account other possible pathologies.

150.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0674121702-01; 0667974422-02; 0657524518-03; 0648198751-02; 0645173873-04; 0636237349-01;    0607588654-05;    0580990679-01;    0580188001-02;    0556981496-01; 0535100036-02; 0192564946-01; 0181220962-04; 0172222127-03; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing where

Defendants failed to take into account other possible pathologies indicated by the reported results, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

151.   It is the duty of an interpreting physician to determine if the nerve conduction studies abnormalities have clinical significance, and to provide an explanation for the apparent nerve conduction studies, which the physicians who purportedly interpreted nerve conduction studies on behalf of the Defendants failed to do.

152.   Failure to take into account abnormalities that indicate that other diagnoses were potentially present was a misrepresentation of the services rendered by the Defendants, and could potentially harm patients by failing to identify a potential medical condition that requires further evaluation and/or treatment, or by resulting in recommendations for the wrong additional diagnostic studies or the wrong treatment(s).

153.   On information and belief, by failing to take into account other possible pathologies, the Defendants showed blatant disregard for the standard of medical care and for the welfare of their patients.

**b) NCV Fraud**

154.   Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely submitted bills for reimbursement to Plaintiffs for expensive NCV tests that reflected services (to the extent any were performed) that were materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.

### i.  Overutilization of NCVs

155.    Standards set forth by the American Medical Association, the American Association of Electrodiagnostic Medicine, and the American Academy of Neurology establish that approximately five (5) NCVs are necessary in order to diagnose radiculopathy in 90% of cases: three (3) motor NCVs and two (2) Sensory NCVs. These same guidelines strongly caution against using more NCVs than necessary in order to diagnose the patient.

156.    On information and belief, because NCV testing is reimbursed for each nerve tested, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice intentionally over-utilized NCV testing and/or fraudulently misrepresented that the NCV testing purportedly rendered was performed, when in fact, it was not, in order to maximize payments from Plaintiffs and profit the Defendants.

157.    Despite the official position of the AMA and medically accepted standards establishing that 90% of all radiculopathy cases can be diagnosed with five NCVs, a review of 52 sample NCV studies submitted by Defendants to Plaintiffs for reimbursement of electrodiagnostic testing reveals the use of excessive NCVs in 32 of 52 (62%) studies, and in 70% of the studies where a diagnosis of radiculopathy was made. By way of example and not limitation, Exhibit "14" in the accompanying Compendium of Exhibits is a table identifying sample claims where NCVs were over-utilized.

158.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0674121702-01; 0659483598-01; 0645173873-04; 0636237349-01; 0580990679-01; 0580188001-02; 0556981496-01; 0535100036-02; 0192564946-01; and 0181220962-04, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD

Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing where Defendants overutilized NCVs, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

159.    On information and belief, assuming that Defendants actually performed the billed-for studies, the over utilization of NCVs served no purpose other than to enrich Defendants through higher reimbursement, while needlessly exposing their "patients" to increased pain associated with the electrical stimulations required by the testing.

160.    On information and belief, as a matter of practice, procedure, and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice over-utilized NCV studies in order to fraudulently bill Plaintiffs for services that were excessive, unnecessary, unreasonable, and performed, if at all, solely to maximize profits.

### ii.    Failure to Diagnostically Account for Abnormal NCV Parameters

161.    When NCV studies are performed, the results are compared to normal standards for that electrodiagnostic laboratory. These standards are often included on the NCV study data table, and when a result falls outside of the normal expected value, it must be noted and addressed.

162.    In numerous instances, the Defendants failed to note and account for abnormal NCV studies (NCV study results falling outside the normal values).

163.    By way of example and not limitation, in the upper limb study of Covered Person A.A., claim number 0657524518-03, notwithstanding that the "Sensory: Right Median amplitude" of 14.3 mV was below the listed norm of 18 mV, and the "Sensory: Right Ulnar

43

amplitude" of 10.3 mV was below the listed norm of 18 mV, Defendant Kanter Physical Medicine & Rehab failed to document, explain, or otherwise account for the abnormal NCV parameter.

164.    By way of further example and not limitation, in numerous instances, Covered Persons' motor nerve conduction studies showed significantly higher amplitude (at least 25%) on proximal stimulation than on distal stimulation.

165.    When a motor nerve is stimulated at two different sites (for example the wrist and the elbow), the resulting amplitudes of the evoked responses are normally approximately equal. This is because most fibers, once stimulated, are able to deliver their electrical contribution to the total evoked response.

166.    On information and belief, except for relatively rare cases of anomalous innervation, there is no known clinical scenario (normal or pathological) in which the amplitude of the distal evoked response is significantly lower than that obtained with proximal stimulation.

167.    On information and belief, upon such an anomalous result, it is the responsibility of the physician or technician to repeat the study until it is clear that the correct response has been obtained, and if the responses cannot be improved, make note of these abnormalities in the final interpretation and their impact on the final diagnosis.

168.    Notwithstanding the foregoing, a review of 52 sample NCV studies submitted by Defendants to Plaintiffs for reimbursement of electrodiagnostic testing revealed significantly higher amplitude (at least 25%) on proximal stimulation than on distal stimulation on 28 nerves within 23 studies (44%).

169.    Moreover, in none of the instances where the Electrodiagnostic Testing revealed significantly higher amplitude on proximal stimulation than on distal stimulation did defendants mention or attempt to correct this finding.

170.    For example, with respect to Covered Person K.L., Claim Number 0696486778-01, in the NCV study of the Ulnar motor nerve for the patient, the right Ulnar motor nerve amplitude stimulation at the elbow was 8.6 mV, which was significantly higher than the amplitude when stimulated at the wrist (3.5 mV), 23 cm distally. Thus, the proximal amplitude was 246% higher than the distal amplitude. Despite this, Defendant Kanter Physical Medicine & Rehab failed to mention this abnormality or attempt to correct it, demonstrating that, to the extent performed at all, the billed for NCV were medically unnecessary and provided pursuant to the scheme to defraud alleged herein.

171.    The failure of the Defendants to account for the abnormal NCV parameters demonstrated a complete disregard for the actual results of these studies and a misrepresentation that the NCV studies purportedly performed.

### iii.    Unreported Conduction Block Falsely Interpreted as Normal

172.    By way of further example of Defendants' NCV fraud, in numerous instances Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted electrodiagnostic testing reports in support of claims for reimbursement that included NCV data and waveforms which demonstrated a significant drop in proximally evoked motor nerve amplitude responses as compared to distal, indicative of conduction block, an electrodiagnostic finding suggestive of a serious medical problem, which Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice failed to report was present, and failed to incorporate in the diagnosis of each NCV study in which the conduction block occurred.

173.    According to the AMA, conduction block is an important pathologic finding. NCV studies are performed to assess the integrity of and diagnose diseases of the peripheral nervous system and an NCV report should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values, and amplitude, and include a final diagnosis.

174.    By failing to indicate that a conduction block was present in the studies in which it occurred, Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's reports failed to meet the basic criteria of the CPT code, and thereby such services were not rendered as billed and in accordance with the applicable CPT code.

175.    In addition to failing to report and/or diagnose the presence of conduction block, in numerous instances, the NCV studies submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice were falsely interpreted by them to be within normal limits, when in fact, the data they submitted, upon which these interpretations were purportedly based, contained data values and abnormal electrodiagnostic findings indicative of conduction block, that if taken at face value are suggestive or diagnostic of an underlying neuropathy that were entirely ignored. By ignoring these obvious abnormalities, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills to Allstate for reimbursement under the No-fault Law. By way of example and not limitation, Exhibit "15" in the accompanying Compendium of Exhibits is a table identifying sample claims where NCVs in which conduction block was present but failed to be noted and properly interpreted.

176.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0674121702-01; 0659483598-01; 0648198751-02; 0645173873-04; 0607588654-05; 0580188001-02; 0556981496-01; 0535100036-02; 0192564946-01; 0181220962-04; and 0156952236-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing where NCV testing results indicated that a conduction block was present, yet not noted or properly interpreted by Defendants, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

177.    On information and belief, were the reported abnormal data values submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate true and the cause of the apparent neuropathy not diagnosed and treated, the patients would be placed at risk for progressive neurological disorders and/or underlying disease.

178.    On information and belief, were the reported abnormal data values submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate true, emergent diagnostic workups were required to identify the cause of said neuropathy or other nerve injury. In each instance, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice failed to perform the required follow-up or diagnostic testing consistent with the abnormal findings. Rather, the abnormal findings were often reported as being within "normal" variance or were otherwise ignored.

179.    On information and belief, the abnormal data values were ignored because they were known to be fictitious and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

180.    On information and belief, if the abnormal data values reported by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice were true and went untreated, the Covered Persons would have been left to suffer from various neuropathies, including potentially grave neuropathies and undiagnosed systemic diseases, such as Guillain-Barre syndrome (GBS), chronic inflammatory demyelinating polyneuropathy (CIDP) and multifocal motor neuropathy with persistent conduction block (MMN).

181.    Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice did not either rule out conduction blocks or diagnose the potentially serious conditions that cause conduction blocks in the aforementioned studies because they knew that the studies were bogus, fictitious, and therefore not indicative of any underlying condition warranting additional examination or diagnostic testing.

### iv.    Overutilization of F-wave Tests

182.    The F-wave is a late combined motor action potential resulting from the backfiring of antidromically activated motor neurons by a supramaximal stimulus.

183.    On information and belief, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, as a matter of pattern and practice, routinely over-utilized F-wave tests to fraudulently bill Allstate for services that were performed, if at all, solely to maximize reimbursement to Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice.

184.    Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted electrodiagnostic testing reports to Allstate in support of claims for reimbursement,

which demonstrated that Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Covered Persons.

185.    By way of example and not limitation, representative claims submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate for reimbursement in which Defendants purportedly performed four (4) F-wave tests in each upper and lower limb NCV of the Covered Persons include but are not limited to Covered Persons: K.L., claim number 0696486778-01; D.R., claim number 0645173873-04; D.M., claim number 0607588654-05; S.M., claim number 0228566410-04; and G.A., claim number 0181220962-04.

186.    Performing four (4) F-waves tests in all NCV studies of Covered Persons who have been involved in automobile accidents, or even Covered Persons with suspected radiculopathy, is contrary to accepted medical practice, which dictates the use of an EMG to diagnose radiculopathy, as opposed to the F-wave tests that were purportedly performed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice .

187.    On information and belief, the over-utilization of F-wave tests by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice was intentionally designed to fraudulently increase reimbursement from Allstate through Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's purported routine performance of unnecessary, excessive testing. Assuming that Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice actually performed the billed for tests, the over utilization of F-wave tests served no purpose other than to enrich Defendants through higher reimbursement, while needlessly exposing Covered Persons to increased pain associated with a minimum of forty uncomfortable electrical stimulations required by the testing.

188.    Billing for the F-wave tests was a misrepresentation by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice that the tests were medically indicated or within the standard of care for proper treatment, when in fact they were not, and knowingly administering this unnecessary testing to Covered Persons evidenced a wanton disregard by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice for their welfare.

> **v.    Improper Performance of F-wave Tests and Misrepresented Findings**

189.    In addition to the intentional and fraudulent over utilization of F-wave tests, on information and belief, in numerous instances, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice knowingly failed to administer F-wave testing in accordance with the prevailing standard of care and the requirements of the applicable CPT code, rendering the F-wave test results invalid and unusable for clinical purposes.

190.    In that regard, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely, intentionally and fraudulently billed Allstate for F-wave tests that were not medically necessary, purportedly to diagnose radiculopathy (the ostensible justification for the test in the first place), despite F-wave tests lacking proven medical efficacy for such diagnoses, and then, in performing this wholly unnecessary test, routinely failed to conduct a sufficient number of stimulations per each nerve tested in order to observe the required number of ten (10) F-wave responses per test.

191.    According to the AMA, who owns and defines the meaning of the CPT codes under which Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice billed for nerve conduction studies, at least ten (10) F-waves should be assessed to arrive at a reasonably accurate F-wave latency. Performing enough stimulations to observe a minimum of ten (10) F-waves is also a requirement of the CPT code.

192.    In a review of 52 electrodiagnostic studies purportedly performed by the Defendants, the accompanying reports failed to reflect the performance of a sufficient number of stimulations to produce the required ten (10) F-waves in 50 of 52 (96%) of studies performed.

193.    By way of example and not limitation, representative claims submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate for reimbursement which fail to identify ten (10) visible F-waves in each nerve tested include Covered Persons: D.M., claim number 0674121702-01; D.R., claim number 0645173873-04; M.N., claim number 0636237349-01; J.G., claim number 0172222127-03, and R.S., claim number 0142653096-03.

194.    By failing to perform the F-wave testing within the requirements of the CPT code and the prevailing standard of care, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice failed to provide the fundamental professional medical services for which they fraudulently submitted and/or conspired to submit bills related thereto, to Allstate for reimbursement under the No-fault Law.

### vi.    Medically Unnecessary H-Reflex Tests

195.    Submaximal stimulation of some mixed nerves (nerves that contain both motor and sensory fibers) causes an H-reflex to occur. When a submaximal stimulus is delivered to the mixed nerve, the sensory fibers are stimulated and the resulting wave of depolarization travels up the sensory nerve, makes a synapse (connection) in the spinal cord, and then comes back down the motor fibers to give a muscle response. This is most easily done at the S1 level when stimulating the tibial nerve behind the knee (popliteal fossa) and recording over the soleus muscle (in the calf). The H-reflex can be performed in other mixed nerves but is most practical clinically at S1 using the tibial nerve. A latency difference of 2.0 milliseconds or more between

the two sides indicates a problem in the slower side's H-reflex arc, with S1 radiculopathy the most frequent cause of the slowing.

196.    Despite its utility in the diagnosis of unilateral S1 radiculopathy, it is not medically necessary to perform H-reflex testing in every lower limb electrodiagnostic study, as standard EMG and NCVs are more than adequate for the diagnosis of unilateral S1 radiculopathy in the great majority of cases. Additionally, H-reflex testing should only be performed when there is a suspicion for S1 radiculopathy, based on the patient's clinical picture (their symptoms and physical exam findings). *See, e.g.,* Utility of Electrodiagnostic Testing in Evaluating Patients With Lumbosacral Radiculopathy: An Evidence-Based Review (Muscle & Nerve. August 2010).

197.    Despite the absence of any medical need to conduct H-reflex testing in addition to standard electrodiagnostic testing, as part of their Fraudulent Treatment Protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted medical reports reflecting the performance of H-reflex tests in addition to standard EMG and NCV testing, in order to fraudulently bill and receive payment from Plaintiffs for testing that was not performed as billed, not medically necessary, and/or was of no diagnostic value.

198.    By way of example and not limitation, in a review of 26 lower limb electrodiagnostic studies purportedly performed on Covered Persons by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, H-reflex was performed on all 26 (100%). Exhibit "16" in the accompanying Compendium of Exhibits is a table identifying the aforementioned claims submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice.

199.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim

numbers 0674121702-01; 0667974422-02; 0648198751-02; 0645173873-04; 0607588654-05; 0580990679-01; 0580188001-02; 0556981496-01; 0535100036-02; 0192564946-01; and 0172222127-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing where Defendants purportedly conducted H-reflex testing in addition to standard electrodiagnostic testing despite the absence of any medical need, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

200.    The fact that the tibial H-reflex tests were done in all of the lower limb studies demonstrates that the Defendants used the H-reflex as part of their Fraudulent Treatment Protocol relating to lower limb studies.

201.    The systematic and intentional billing for unnecessary H-reflex testing by the Defendants was, and is, contrary to widely accepted medical practices and intentionally designed to fraudulently maximize reimbursement from Plaintiffs.

202.    The over-utilization of H-reflex testing by Defendants regardless of patient symptoms further indicates the use of a protocol approach to NCV testing, whereby Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely and as a matter of course billed for unnecessary and diagnostically worthless testing in order to artificially inflate the reimbursement received from Plaintiffs.

**vii.    Diagnoses Incompatible with H-Reflex Data**

203.    Published studies and accepted medical authorities indicate that when an H-reflex study is conducted at the S-1 level, a latency difference of 2.0 milliseconds or more between the two sides indicates a high likelihood of radiculopathy on the side showing the longer latency.

204.    In numerous instances, Defendants diagnosed S1 radiculopathy despite normal and symmetric H-reflex latencies. By way of example but not limitation, Defendant Kanter Physical Medicine & Rehab diagnosed Covered Person A.C., claim number 0580990679-01, with left S1 radiculopathy notwithstanding a latency difference recorded on the NCV study report submitted to Plaintiffs of 0.00 milliseconds.

205.    A prolonged H-reflex may be the first, and only, abnormality in an S1 radiculopathy. Diagnosing an S1 radiculopathy in the setting of a normal H-reflex is an incompatibility that should be addressed by the physician, which the Defendants failed to do.

206.    Moreover, in numerous instances Defendants diagnosed S1 radiculopathy on the wrong side of the body.  By way of example but not limitation, Defendant Miriam Kanter MD Practice diagnosed Covered Person M.S., claim number 0228566410-04, with left S1 radiculopathy, meaning that the H-reflex should have been longer by at least 2.0 ms on the left side, notwithstanding a latency difference recorded on the NCV study report submitted to Plaintiffs indicated that the H-reflex was longer on the right side.

207.    By failing to account for the incompatibility of H-reflex data with the stated diagnosis, Defendants potentially endangered Covered Persons by providing the wrong or inaccurate diagnosis, which usually leads to incorrect or inappropriate treatments, some of which can result in significant morbidity (e.g., epidural steroid injections, lumbar spine surgery, etc.).

This is a misrepresentation that the H-reflexes were performed and interpreted at the standard of care.

208.    Defendants' rendering of diagnoses incompatible with the H-reflex data indicate that they knew or should have known that the tests were bogus, fictitious, and not intended to actually diagnose a Covered Person's medical condition, but instead, intended solely to generate payments from insurance companies, in general, and Plaintiffs, in particular.

209.    By submitting reports for purported H-reflex testing in which the diagnosis was incompatible with the test data, Defendants fraudulently billed and/or received payment from Plaintiffs for testing that was not performed as billed, was not medically necessary, and/or was of no diagnostic value.

### c)  EMG Fraud

210.    The Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely submitted bills for reimbursement to Plaintiffs for expensive EMG tests that reflected services (to the extent any were performed) that were materially misrepresented, fabricated and/or never performed or performed in a way that could not possibly produce valid data or results.

### i.    Improper Performance of EMG Studies

211.    On information and belief, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely failed to perform EMG studies at the standard of care and reported final diagnoses that could not be justified based on Defendants' failure to perform the EMG in a valid manner.

212.    The standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy.

213.    Notwithstanding the foregoing, in numerous instances, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted electrodiagnostic testing reports to Allstate which contained diagnoses of radiculopathy in the upper and/or lower limb studies that could not be justified because an insufficient number of muscles were tested per limb. Representative examples of these claims include Covered Persons: A.A., claim number 0657524518-03; A.T., claim number 0590067724-02; A.J., claim number 0580188001-02; M.S., claim number 0228566410-04; M.C., claim number 0219911897-01; A.S., claim number 0192564946-01; G.A., claim number 0181220962-04; M.S., claim number 0180004541-03; R.B., claim number 0159765642-02; S.K., claim number 0156952236-03; and R.S., claim number 0142653096-03.

214.    Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's failure to test a sufficient number of limb muscles required for a screening EMG renders the EMG studies invalid and of no diagnostic value and does not adequately support the given diagnoses.

215.    In addition, despite their failure to test a sufficient number of limb muscles, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice fraudulently billed for a full limb of EMG in order to maximize their reimbursement. According to the AMA, who owned and defines the meaning of the CPT codes under which Defendants billed for EMG studies, in order to bill for EMG studies under CPT Codes 95860-95866 (the CPT codes used by Defendants), at least 5 limb muscles or 4 limb muscles plus paraspinal muscles must be studied per limb.

216.    Many of the EMG reports submitted by Defendants to Allstate failed to reflect the performance of the required number of limb muscles to constitute a full limb EMG study for which Defendants billed and constitute a willful misrepresentation of the services provided.

**ii.    Failure to Extend EMG from a Screening to Diagnostic Study**

217.    By way of further example of Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's EMG fraud, on information and belief, in numerous instances Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendants failed to extend the EMG studies from screening to diagnostic EMGs when radiculopathy was detected.

218.    As alleged above, the standard practice in electromyography is to sample a minimum of five muscles per limb to screen for the presence or absence of radiculopathy. However, if abnormalities suggestive of radiculopathy are found, the EMG study is extended, and additional muscles are tested in order to establish an accurate diagnosis by defining the radiculopathy to the correct root level.

219.    On information and belief, Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's failure to extend the EMG from screening to diagnostic studies renders the EMG studies invalid and of no diagnostic value and was a material misrepresentation of the services provided.

220.    By way of example and not limitation, Defendants in instances where Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice diagnosed radiculopathy, Defendants failed to extend the study to a sufficient number of limb muscles in order to establish an accurate diagnosis by defining the radiculopathy to the correct level in connection with the following Covered Persons: A.J., claim number 0580188001-02; A.T., claim number

0590067724-02; R.S., claim number 0142653096-03; S.K., claim number 0156952236-03; R.B., claim number 0159765642-02; M.S., claim number 0180004541-03; G.A., claim number 0181220962-04; A.S., claim number 0192564946-01; M.C., claim number 0219911897-01; and M.S., claim number 0228566410-04.

### iii.    Overutilization of EMG Testing

221.    By way of further example of Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's EMG fraud, in numerous instances Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted electrodiagnostic testing reports in support of claims for reimbursement which demonstrated that Defendants purportedly performed medically unnecessary EMG studies in violation of the American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM) guidelines.

222.    Performing a four extremity EMG is not medically necessary for the diagnosis of radiculopathies.

223.    In that regard the Professional Practice Committee (PPC) of the AANEM recommends as follows:

> Don't do a four limb needle EMG/nerve conduction study (NCS) testing for neck and back pain after trauma.  Although techniques such as needle EMG and NCS can be helpful to diagnose pinched nerve in the neck or back (cervical or lumbar radiculopathy), four limb needle EMG/NCS is not needed and is not considered appropriate testing but does increase costs.

"AANEM's Top Five Choosing Wisely Recommendations" (April 2015, *Muscle & Nerve*, p. 617-619).

224.    Notwithstanding that four extremity EMG is not indicated for post-trauma neck and back pain, and is thus medically unnecessary, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely submitted claims to Plaintiffs for

electrodiagnostic testing in which Defendants purportedly performed four extremity EMG on the same day.

225.    By way of example and not limitation, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice performed medically unnecessary four extremity EMGs on and submitted claims for reimbursement in connection with the following Covered Persons: R.V., claim number 0582981023-01; A.J., claim number 0580188001-02; S.M., claim number 0573726361-01; V.R., claim number 0535100036-02; S.C., claim number 0521527176-04; R.P., claim number 0274579754-03; M.S., claim number 0228566410-04; A.S., claim number 0192564946-01; M.S., claim number 0180004541-03; and R.B., claim number 0159765642-02.

### d)  Protocol Approach to NCV & EMG Testing

226.    As a matter of practice and procedure, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice used what is known as the "protocol approach" to perform NCVs and EMGs, when in fact accepted medical practice and the AMA requirement is that such tests be performed using what is known as a "dynamic" examination or approach as a prerequisite for billing under NCV and EMG CPT codes.

227.    Unlike the protocol approach utilized by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice that resulted in the same set of nerves and muscles purportedly being tested regardless of the Covered Persons' symptoms and findings, the dynamic approach (also known as a "progressive" examination) actually takes into account the individual symptoms and the results and findings of each nerve and muscle tested, resulting in a logical, coherent and constantly evolving electrodiagnostic evaluation, evidenced by variation of the nerves and muscles tested on a case-by-case basis.

228.    Even though NCVs and EMGs must be performed dynamically, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice used the protocol approach, which fails to recognize that the nerves and muscles studied should change from case to case and evolve within a case as the study proceeds.

229.    Use of the dynamic approach is a prerequisite for the use of the electrodiagnostic CPT codes and, in using the protocol approach as a matter of practice, procedure and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice submitted bills to Allstate for reimbursement of NCVs wherein they represented the services were validly performed and reimbursable under the No-fault Law, when in fact they were not.

230.    Even though Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's utilization of a protocol approach to the selection of NCVs was violative of the requirements of the applicable CPT codes, Defendants sought reimbursement, and were paid by Allstate, for such services that they knew or should have known were not validly performed, were of no diagnostic value and were fraudulent and not reimbursable under the No-fault Law. By way of example and not limitation:

- Representative examples of claims wherein the Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice purportedly sampled the same 10 nerves (Bilateral Motor Median and Ulnar, Bilateral Sensory Median, Radial and Ulnar) in the upper limb nerve conduction tests include Covered Persons: S.K., 0156952236-03; R.B., 0159765642-02; M.S., 0180004541-03; G.A., 0181220962-04; M.S., 0228566410-04; F.W., 0252161468-05; V.R., 0535100036-02; A.J., 0580188001-02; D.M., 0607588654-05; D.R., 0645173873-04; A.R., 0659483598-01; and S.Y., 0664230331-03; and

- Representative examples of claims wherein the Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice purportedly sampled the same 8 nerves (Bilateral Motor Peroneal and Tibial, Bilateral Sensory Superficial Peroneal and Sural) in the lower limb nerve conduction tests include Covered Persons: S.K., 0156952236-03; R.B., 0159765642-02; M.S., 0180004541-03; G.A., 0181220962-04; M.S.,

0228566410-04; V.R., 0535100036-02; A.J., 0580188001-02; D.M., 0607588654-05; D.R., 0645173873-04; O.M., 0667974422-02; and K.L., 0696486778-01.

231.    The use of the "protocol approach," which, if administered at all, was employed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice and increases the likelihood of invalid diagnoses and medically unreasonable and unnecessary electrodiagnostic testing.

232.    Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's use of the "protocol approach" (as opposed to utilizing the "progressive" or "dynamic" examination approach) in performing NCVs is contrary to the well accepted practices of the medical community.

233.    Defendants Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's use of the "protocol approach" is contrary to the requirements for billing for electrodiagnostic services under the CPT codes used by the Defendants in seeking reimbursement from Allstate, and reflects a pattern and practice of billing for services that were bogus, medically necessary and/or of no diagnostic value.

234.    Since the NCV testing was substantially or routinely performed in a manner that could not possibly produce medically valid results, none of the medically accepted electrodiagnostic procedures were followed, rendering the purported services billed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate not only of no diagnostic value, but fraudulent.

235.    By submitting to Allstate fictitious bills and documentation for NCV and EMG testing, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice misrepresented the services purportedly rendered and billed for services which were not

rendered, or for services performed in an invalid manner, rendering the results of no diagnostic value.

236.    A protocol approach to electrodiagnostic studies is clinically unacceptable and does not meet the standard required for billing for services under the applicable CPT code, and therefore bills submitted by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Allstate in connection therewith were fraudulent and potentially exposed the Covered Persons to an incorrect diagnosis and treatment plan.

### e)  Fraudulent unbundling of NCV Billing

237.    In furtherance of the scheme to defraud alleged herein, Kanter Physical Medicine & Rehab routinely unbundled charges on claims submitted to Plaintiffs in connection with NCV testing it purportedly performed on Covered Persons.

238.    In that regard, prior to April 1, 2018, the appropriate CPT code for motor NCVs conducted with an F-wave study was 95903, and the appropriate CPT code for sensory NCVs was 95904, which were assigned relative values of 19.70 and 12.60, per unit, respectively.

239.    Starting April 1, 2018, the fee schedule adopted the newly created CPT codes for NCVs that combined motor NCVs, sensory NCVs and F-wave studies into a single set of codes, 95907 through 95913, defined by the number of studies conducted, and assigned relative values ranging from 19.02 for 95907, reserved for 1-2 studies, to 56.03 for 95913, reserved for 13 or more studies.

240.    Notwithstanding the foregoing, many bills for NCV testing submitted by Defendant Kanter Physical Medicine & Rehab to Plaintiffs for services provided after April 1, 2018, continued to separately bill for motor NCV studies with F-wave studies under CPT code 95903 and sensory NCV studies under CPT code 95904, by which Kanter Physical Medicine &

Rehab billed Plaintiffs far in excess of what it was permitted to charge under the Fee Schedule. By way of example but not limitation, Exhibit "17" in the accompanying Compendium of Exhibits contains a representative sample of claims where Defendant Kanter Physical Medicine & Rehab fraudulently unbundled charges on claims submitted to Plaintiffs in connection with NCV testing.

241.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0580990679-01; 0580188001-02; 0556981496-01; 0535100036-02; 0523800712-01; 0513933135-01; 0513905018-02; and 0506357656-02, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, mailed or caused to be mailed fraudulent claims for electrodiagnostic testing which fraudulently separately billed for motor NCV studies with F-wave studies, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

### 4.    The Fraudulent Physical Therapy Services

242.    In furtherance of the Fraudulent Treatment Protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter, MD Practice, purported to routinely perform physical therapy on Covered Persons that were treated at the Richmond Hill Clinic, irrespective of medical necessity.

243.    In many instances, Covered Persons would receive physical therapy at the Richmond Hill Clinic either on the day of their first visit there, or shortly thereafter, irrespective of whether the Covered Person had first been seen by a medical doctor and referred for physical therapy, as required by the No-fault law. *See*, N.Y. Ins. Law § 5102(a)(1)(ii).

244.    On information and belief, in those instances where Defendants Kanter Physical Medicine & Rehab and Miriam Kanter, M.D. Practice provided physical therapy services for Covered Persons irrespective of whether there was a referral from the treating physician, they did so because they knew that as part of the Fraudulent Treatment Protocol established at the Richmond Hill Clinic, virtually all Covered Persons were referred for physical therapy services irrespective of medical necessity.

245.    The physical therapy services purportedly performed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter, M.D. Practice rarely varied from patient to patient, nor did any particular Covered Person's physical therapy change based upon an alleged worsening or improving of the Covered Person's condition.

246.    The physical therapy services purportedly performed by Defendants Kanter Physical Medicine & Rehab and Miriam Kanter, M.D. Practice virtually always, if not always, involved from two to five passive modalities, which would occur on every Covered Person, to the extent that they were performed at all.

247.    On information and belief, in order to support the phony physical therapy treatment, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter, M.D. Practice would routinely recommend physical therapy up to three times a week as part of their medical initial and follow-up examination reports.

248.    On information and belief, in order to support the phony physical therapy treatment, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice would proceed with physical therapy treatment solely based on their medical exam without an initial evaluation by a physical therapist.

249.    The initial medical examination and/or follow-up examination reports submitted to Plaintiffs would routinely include identical or nearly identical goals for physical therapy, including: (i) to decrease pain; (ii) to decrease muscle spasm; (iii) to increase mobility and endurance; and (iv) to improve activities of daily living; and encourage a home exercise program between physical therapy sessions.

250.    Once the bogus justification for the commencement of unnecessary physical therapy was documented in the medical initial and follow-up examination reports, Defendants would bill Plaintiffs for purportedly providing Covered Persons the same physical therapy services on virtually every visit, consisting of at least manual therapy and therapeutic exercise, often combined with electrical stimulation, hot/cold packs, and/or therapeutic ultrasound treatments.

251.    In order to justify continued physical therapy services, as well as to substantiate the purported physical therapy services in claims for reimbursement submitted to Allstate, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice documented the purported treatment of patients on boilerplate reports ("Daily Notes").

252.    By way of example and not limitation, the Daily Notes submitted to Plaintiffs by Defendant Kanter Physical Medicine & Rehab rarely, if ever, documented the nature of therapeutic exercises and/or manual therapy performed, the duration of such exercises and other treatment modalities, or Covered Persons' responses to such exercises and other treatment modalities.  A representative sample of the aforementioned Daily Notes is contained in Exhibit "18" within the Compendium of Exhibits to the Complaint.

253.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim

numbers 0657524518-03; 0648198751-02; 0647267665-04; 0636237349-01; 0590067724-03; 0556981496-01; 0535100036-02; 0228566410-04; 0219911897-01; and 0215431016-08, in which Defendant Kanter, through Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, mailed or caused to be mailed fraudulent claims for physical therapy services, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

### 5. The Fraudulent Chiropractic Services

254. In furtherance of the Fraudulent Treatment Protocol, Defendant Chiropractic Associates of RH submitted bills to Plaintiffs for chiropractic services purportedly performed on virtually all Covered Persons that were treated at the Richmond Hill Clinic irrespective of medical necessity, and despite chiropractic treatment rarely being medically necessary for motor vehicle accident patients with neck and back pain who are also undergoing physical therapy.

255. As part of the fraudulent protocol established by the Defendants, Covered Persons that were purportedly given chiropractic examinations were nearly always diagnosed with identical conditions that were documented in the same way on boilerplate initial reports prepared by Defendant Chiropractic Associates of RH (the "Initial Chiropractic Reports"). In furtherance of the fraudulent protocol, Covered Persons received chiropractic treatment at the same time they received physical therapy and regardless of the result or efficacy of the physical therapy treatment.

256. On information and belief, the Initial Chiropractic Reports were utilized by the Defendant Chiropractic Associates of RH for no other purpose than to "document" the purported injuries of Covered Persons in a manner which would fraudulently induce payment from insurers

in general, and Allstate, in particular, as well as to feign the existence of injuries which could justify further chiropractic treatment.

257.    The Initial Chiropractic Reports contained boilerplate text with respect to each Covered Person's current condition, character of pain, diagnosis, and treatment plan, which rarely varied for each patient.

258.    By way of example but not limitation, in furtherance of the scheme to defraud, the Initial Chiropractic Reports submitted to Plaintiffs by Defendant, as a matter of pattern, practice and protocol, routinely:

- Reported complaints of Covered Persons including but not limited to pain in at least two, and usually three regions of the spine, and limited cervical and thoraco-lumbar ranges of motion accompanied by pain;

- Reported the patient's condition as "unchanged" and the patient's pain as "constant";

- Reported pain levels of 8-10 of 10 for nearly all Covered Persons;

- Reported the character of pain as "sharp" at all regions as well as "stiff" and "sore" at nearly all regions for nearly all Covered Persons; and/or

- Failed to specify the frequency or duration of chiropractic treatments as part of the Covered Person's treatment plan.

259.    In furtherance of the scheme to defraud alleged herein, the chiropractic examinations purportedly performed on Covered Persons routinely resulted in the same common diagnoses, and treatment plans which were rarely, if ever, adjusted during the course of treatment in response to changing patient conditions.

260.    On information and belief, Initial Chiropractic Reports were used for no other purpose than as a vehicle through which the Defendant Chiropractic Associates of RH could document fictitious Covered Person injuries in order to justify the purported performance of, and billing for, medically unnecessary chiropractic treatments.

261.    Once Covered Persons began their courses of additional chiropractic treatment, Covered Persons' purported progress was documented in Subjective, Objective, Assessment, and Plan notes (the "Chiropractic SOAP Notes"), which, as with the Initial Chiropractic Reports, contained boilerplate text which varied little between each Covered Person. By way of example and not limitation, as a matter of pattern, practice and protocol, the Chiropractic SOAP Notes routinely:

- Documented most, if not all Covered Persons as having complaints of neck pain, mid-back pain; and/or low-back pain;

- Documented that most Covered Persons' treatment plans should "continue chiropractic care";

- Documented "tenderness" along with either "grimace or flinch" or "with withdrawal and jump sign" as a result of palpation for most Covered Persons; and

- Documented restricted range of motion for Covered Persons in one or more regions of the spine.

262.    On information and belief, the Chiropractic SOAP Notes were used for no other purpose than as a vehicle through which Defendant Chiropractic Associates of RH could document medically unnecessary treatment in order to justify the purported performance of, and billing for, further chiropractic treatment which was rarely, if ever, effective in alleviating the purported injury for the Covered Persons or tailored to the needs of any individual Covered Person. A representative sample of the aforementioned Chiropractic SOAP Notes is contained in Exhibit "19" within the Compendium of Exhibits to the Complaint.

263.    Moreover, as a matter of pattern, practice and protocol, Defendant Chiropractic Associates of RH routinely provided Covered Persons with chiropractic manipulations that did not change in type depending on whether the Covered Persons' purported injury improved or did not improve.

264.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0694458852-01; 0689509833-01; 0667974422-02; 0657524518-02; 0645173873-04; 0607588654-05; 0582981023-01; 0573726361-01; 0556981496-01; 0548069368-02; and 0535100036-02, in which Defendant Nissenbaum, through Chiropractic Associates of RH, mailed or caused to be mailed fraudulent claims for chiropractic evaluations and treatments, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

### 6.    The Fraudulent Computerized Range of Motion and Manual Muscle Testing

265.    On information and belief, in furtherance of the scheme to defraud alleged herein, and as a matter of practice, procedure and protocol, numerous patients treated at the Richmond Hill Clinic were subjected to medically unnecessary computerized Range of Motion and Muscle Tests that were billed for through Defendants Kanter Physical Medicine & Rehab and/or Miriam Kanter MD Practice, which Defendants knew, or should have known, were medically unnecessary and/or of no clinical or diagnostic value.

266.    On information and belief, the measurement of the ability for each joint to fully perform its anatomical function is a patient's range of motion for each joint.

267.    On information and belief, traditional, or manual range of motion testing consists of the non-electronic measurement of a joint's ability to move through various angles within its arc of motion using a manual inclinometer or goniometer, which is compared to the generally agreed upon values for the full ranges of motion of the unimpaired or ideal joint, as published in standard texts.

268.    On information and belief, active range of motion testing refers to range of motion testing where the clinician directs the patient to move a joint to the full extent the patient is capable.

269.    On information and belief, active range of motion testing can be inaccurate if the patient does not provide full effort.

270.    On information and belief, passive range of motion testing refers to range of motion testing where the clinician moves a patient's joints to identify restrictions of movement, pain caused by movement, and whether a grating sound or sensation is produced with the joint's movement. Passive range of motion testing is only performed when the patient is unable to actively perform an active range of motion exam or if there is obvious pain with active motion of the joint.

271.    On information and belief, a manual muscle strength test consists of a non-electronic measurement of muscle strength, by having the patient move a joint against resistance applied by the clinician, and grading the patient's tolerance to the resistance according to what is known as the Oxford Scale or Medical Research Council Manual Muscle Testing Scale, which rates the patient's tolerance on a scale of 0 to 5. For example, if a physician were to measure a person's knee flexion strength, he or she would first determine whether the patient could flex their knee against the force of gravity without additional resistance, and if the patient is capable, apply resistance against the person's posterior foreleg while having them flex their knee.

### a) Defendants' Computerized Range of Motion and Computerized Muscle Testing was Medically Unnecessary When Manual Testing was Performed as Part of Initial and Follow-Up Examinations

272.    On information and belief, a physical examination performed on a person to diagnose a patient presenting with soft-tissue injuries will typically require manual range of motion testing and muscle strength testing to assess injury and develop a treatment plan. These

70

documented range of motion and strength impairment measurements provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.

273.    On information and belief, manual range of motion and strength tests are regularly performed on patients as part of their initial evaluation and any follow-up examination, and accordingly are billed as part of the charge, and under the CPT code for the initial or follow-up evaluation.

274.    On information and belief, computerized range of motion testing is purportedly performed by the placement of a digital inclinometer on various parts of a patient's body while the patient is asked to move the related joint through its available motion. Computerized range of motion testing is nearly identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one. To the extent a clinician performs active computerized range of motion testing, this test is dependent upon patient cooperation and effort, and whether active or passive, is likewise dependent on the skill of the examiner.

275.    On information and belief, computerized muscle testing is purportedly performed through the placement of a digital device against a limb to be tested while the patient attempts to flex the muscle against resistance applied by the clinician, and is nearly identical to the traditional or manual muscle strength testing performed by clinicians during an initial and/or follow-up examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a reading on a 0 to 5 scale.

276.    On information and belief, the digital recordings do not take into account whether the patient is applying full effort, and thus, the accuracy of computerized muscle testing is dependent upon patient cooperation, effort, and the skill of the examiner.

277.    On information and belief, when the computerized range of motion and muscle tests are performed, the decision of which joints and which muscles to test should be tailored to the unique clinical findings regarding each individual patient., and accordingly, the particular joints and muscles tested should be individualized for each patient.

278.    On information and belief, while computerized range of motion and muscle testing performed separately from traditional or manual testing as part of initial and follow-up exams may be useful tools in assessing spinal cord injuries, neurological conditions, movement disorders, or as part of medical research studies, under the circumstances employed at the Richmond Hill Clinic, they were medically unnecessary and, to the extent such testing was performed at all, they were performed and billed for pursuant to a pre-determined treatment protocol irrespective of each Covered Person's individualized need, designed solely to maximize profits.

279.    In particular, most patients at the Richmond Hill Clinic purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and/or follow-up examinations with the medical and/or chiropractic practices at the Richmond Hill Clinic.

280.    In that regard, each initial examination report submitted by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Plaintiffs contains Kanter Physical Medicine & Rehab's and Miriam Kanter MD Practice's conclusions concerning the manual range of motion and manual muscle testing purportedly conducted during these examinations.

281.    Notwithstanding the foregoing, Defendants regularly submitted bills to Allstate for reimbursement for medically unnecessary computerized range of motion and muscle tests purportedly performed on Covered Persons.

282.    On information and belief, the computerized range of motion and muscle tests were not tailored to each Covered Person's individual needs, did not provide any additional actionable data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.

283.    On information and belief, in the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

284.    Even if there was a reason to perform computerized range of motion and muscle tests, on information and belief, the methods in which the tests are performed were not tailored to the individual Covered Persons, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in a treatment program.

285.    On information and belief, while a clinician can take measurements of a variety of limb movements in each test, Defendants' tests never tested many joints in the body, while other joints in the body are tested repeatedly irrespective of the Covered Person's specific complaints or conditions, and irrespective of whether or not the joints were previously diagnosed with any pain, deformity, or functional deficit.

286.    By way of example but not limitation, Exhibit "20" in the accompanying Compendium of Exhibits contains a representative sample of claims where Defendants submitted bills to Plaintiffs for medically unnecessary computerized range of motion testing.

### b)  Defendants' Computerized Muscle Testing is of No Diagnostic Value Due to Testing Inaccuracies

287.    Moreover, the computerized muscle testing billed for and purportedly performed by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice, were if no diagnostic value due to apparent inaccuracies in testing results.

288.    In that regard, numerous computerized muscle testing reports submitted by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice recorded inaccurate maximum neck flexion and maximum neck extension strengths, that were necessarily inaccurate given the Covered Person's physical condition as otherwise indicated in the Covered Person's medical records.

289.    By way of example but not limitation, the computerized muscle testing report submitted by Kanter Physical Medicine & Rehab to Plaintiffs in connection with Covered Person V.R., claim number 0389062563-01, purported to record a maximum neck flexion strength of 2.4 pounds, and a maximum neck extension strength of 2.7 pounds.

290.    By way of further example but not limitation, the computerized muscle testing report submitted by Miriam Kanter MD Practice to Plaintiffs in connection with Covered Person M.S., claim number 0180004541-03, purported to record a maximum neck flexion strength of 4.8 pounds, and a maximum neck extension strength of 3.6 pounds.

291.    On information and belief, the human head weighs approximately ten pounds.

292.    On information and belief, were the recordings on the computerized muscle testing report accurate for Covered Persons V.R. and M.S., it would have been impossible for the Covered Persons to lift their heads off a bed, control their necks while standing, or hold their necks in extension while standing, yet there was no documentation in the Covered Persons' charts that the Covered Persons was unable to lift their heads or control their necks.

293. Due to glaring inaccuracies in the strength values recorded in the computerized muscle testing reports submitted by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice to Plaintiffs, such testing had no diagnostic value.

### c) Defendants' Fraudulent Unbundling of Computerized Range of Motion and Computerized Muscle Testing

294. Irrespective of whether Defendants' computerized range of motion and muscle testing was conducted in a diagnostically useful manner, or was medically necessary, Defendants fraudulently unbundled charges for such services.

295. In that regard, the CPT Assistant sets forth the circumstances in which muscle testing and range of motion testing may be billed separately under CPT codes 95831 or 95833, and 95851, respectively, and when such services must be included in testing that should be billed under CPT code 97750.

296. According to the CPT assistant, to the extent the computerized muscle testing like that purportedly performed and billed for by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice was performed in a diagnostically useful manner or was medically necessary, which it was not, such services would properly be billed under CPT code 97750.

297. However, many of the bills for computerized muscle tests submitted by Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice listed multiple charges under 95831 or 95833, which is designated for "Muscle testing, manual (separate procedure) with report; extremity (excluding hand) or trunk;" and Muscle testing, manual (separate procedure) with report; total evaluation of body, excluding hands, respectively, along with one or more for computerized range of motion testing under code 95851, representing misrepresenting that they performed numerous separate muscle testing and range of motion procedures when, to the extent

they performed anything at all, what was performed was a physical capacity test, billable, if at all, under CPT code 97750.

298.    According to the applicable fee schedule, a healthcare provider seeking reimbursement for range of motion testing may bill under the CPT Code 95851 for a maximum of 5.41 relative units—or $45.72—for each individual "extremity" or "trunk section" which is tested.

299.    According to the applicable fee schedule, a healthcare provider seeking reimbursement for manual muscle tests may bill under CPT Code 95831 for a maximum of 5.16 relative units—or $43.60—for each individual "extremity" or "trunk section" which is tested, and should bill under CPT Code 95833 for a maximum of 13.53-13.55 relative units (depending on date of service)—or $114.32-$114.49—if the entire body is tested.

300.    According to the applicable fee schedule, a healthcare provider seeking reimbursement under CPT Code 97750, the appropriate code for computerized muscle testing either alone or along with computerized range of motion testing, may bill for a maximum of 5.41 relative units—or $45.71—for each fifteen-minute period it took to perform the testing.

301.    However, by billing for each measurement of each test separately, Defendants misrepresented to Plaintiffs that they were entitled to bill for separate measurements independent of each other, resulting in charges ranging from $89.31 to $577.35 per patient per test, rather than the maximum allowable charge of $45.71 for every 15 minutes performing the testing. By way of example and not limitation, Exhibit "21" in the accompanying Compendium of Exhibits is a chart identifying a representative sample of claims where Defendants submitted bills to Plaintiffs for computerized range of motion under CPT and muscle testing, billed under CPT Codes 95831, 95833 and/or 95851.

302.    As a result of the misrepresentations, even if such computerized range of motion and computerized muscle testing had diagnostic value and were properly reimbursable—which they did not and were not—by submitting bills seeking payment for the testing of multiple extremities, and often additionally billing for a full body evaluation, Defendants defrauded Allstate into paying more than Defendants were entitled to be paid.

303.    Accordingly, the test results and supporting documentation submitted in connection with Defendants' claims for reimbursement for computerized range of motion and muscle testing reflected services that, if performed at all, were medically unnecessary and performed pursuant to a pre-determined treatment protocol irrespective of medical necessity.

**7.    The Fraudulent Trigger Point Injections**

304.    In furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely billed Allstate for trigger point injections, as well as ultrasonic guidance in connection with those procedures, when in fact such services were medically unnecessary and/or of no diagnostic or treatment value.

305.    On information and belief, trigger points are small, discrete tender points or muscle knots (usually between 2-5 millimeters in diameter) located in a tight band of skeletal muscle which cause localized and radiating referred pain, and limited range of motion. Trigger points can be identified by palpation (i.e., hand or finger pressure), which will elicit either direct localized pain and/or radiating referred pain and a local twitch.

306.    On information and belief, in order to establish a diagnosis for a major trigger point, there must be complaints of regional pain, pain or altered sensation in the expected distribution of referred pain from the trigger point, a palpable taut band in an accessible muscle

with exquisite tenderness at one point along the length of the muscle, and some degree of restricted range of motion.

307.    On information and belief, a diagnosis for a minor trigger point can be established by either a reproduction of a referred pain pattern by stimulating the trigger point, altered sensation by pressure on the tender spot, a local response elicited by snapping palpation at, or needle insertion into, the tender spot or pain alleviated by stretching or injecting the tender spot.

308.    On information and belief, once a diagnosis is made, various treatment modalities can be used to inactivate trigger points including consultation with a pain management physician, use of analgesics and adjunctive medications, passive or active physical therapy, manipulation therapy, and trigger point injections.

### a) Trigger Point Injections

309.    On information and belief, trigger point injections involve the insertion of a thin needle into a trigger point in order to stimulate the tissue and increase range of motion.

310.    On information and belief, trigger point injections also involve the administration of a small amount of medication, typically a local anesthetic, into the affected area, with the goal of reducing localized pain by relaxing the affected muscles and/or reducing referred pain by interrupting the nerve signaling pathways that cause referred pain.

311.    On information and belief, there is no generally accepted evidence that injecting medication into trigger points improves patients' results.

312.    On information and belief, potential side effects from trigger point injections involving the use of local anesthetics include blood disorders, paralysis, lung failure, seizures, major cardiac and central nervous system effects, and local anesthetic systemic toxicity.

313.    On information and belief, in addition to potential side effects and/or complications resulting from injecting local anesthetics, risks involved from the trigger point injection insertion procedures themselves include serious bacterial skin infection, soreness, bruising, hemorrhages, fainting, fatigue, damage to the central nervous system and major organ puncture.

314.    On information and belief, trigger point injections are considered medically necessary only when the trigger point is presently causing tenderness and/or weakness, restricting motion, and/or causing referred pain when compressed.

315.    On information and belief, trigger point injections should not be used for acute spinal pain.

316.    On information and belief, trigger point injections should not be performed during an initial examination, absent exigent circumstances.

317.    On information and belief, trigger point injections should only be utilized either as a second or third option for non-acute pain that is not resolving with more conservative means (e.g., NSAIDs, exercises) within a six-week time frame.

318.    On information and belief, administering trigger point injections before the patient has completed a minimum of six weeks (and, generally, at least three months) of conservative therapy is considered excessive and medically unnecessary.

319.    On information and belief, patients should be reassessed two weeks after each set trigger point injection session in order to assess any improvement in function, temporary and sustained pain relief, and/or a reduction in the use of a prescribed analgesic medication.

320.    On information and belief, no more than four insertions should be administered during each trigger point injection session.

321.    On information and belief, patients should not undergo more than four trigger point injections sessions during a 12-month period.

322.    On information and belief, patients should wait at least three to four weeks after a trigger point injection session before undergoing any subsequent trigger point injections.

323.    On information and belief, trigger point injections should be limited to the least number necessary, and the need for repeated injections/insertions should be supported by documentation indicating a benefit from earlier procedures.

324.    On information and belief, repeated trigger point injections sessions are not recommended unless there is both subjective and objective evidence of improvement resulting from the prior trigger point injection session.

325.    On information and belief, absent exigent circumstances, trigger point injections should only be repeated if there is evidence of persistent significant pain, even with partial improvements in range of motion, absent exigent circumstances.

326.    On information and belief, a second set of trigger point injections may be deemed reasonable only if there is at least a partial demonstrated improvement after the first set of injections/insertions.

327.    On information and belief, the medical record must clearly reflect the medical necessity for any repeated trigger point injections.

328.    On information and belief, the use of ultrasound or other imaging studies for trigger point injections is not recommended.

### b)  Defendants' Trigger Point Injections

329.    On information and belief, in furtherance of the scheme to defraud alleged herein, as a matter of practice, procedure and protocol Defendants Kanter Physical Medicine & Rehab

and Miriam Kanter MD Practice routinely performed excessive and medically unnecessary trigger point injections on Covered Persons.

330.    In furtherance of their fraudulent scheme, Defendants documented purported trigger point injections on template forms that purport to reflect diagnoses supporting trigger point injections.

331.    On information and belief, while Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely recommending the procedure during Covered Persons' initial examinations or during follow-up examinations early in the course of treatment.

332.    Demonstrative of the fact that the trigger point injections were medically unnecessary and performed, if at all, pursuant to a scheme to defraud, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely failed to provide Plaintiffs with an adequate report to justify their billing for the service.

333.    In that regard, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely billed Plaintiffs for trigger point injections using CPT code 20553, which, for all dates of service relevant herein until October 1, 2020, required submission of a report containing information concerning the nature, extent and need for the procedure or service, time, skill, and equipment necessary, as well as: (i) the Covered Person's diagnosis, pertinent history, and physical findings; (ii) size, location, and number of lesions or procedures where appropriate; (iii) a complete description of the procedure and supplementary procedures; (iv) when possible, the closest similar procedure by number and unit value; (v) estimated follow-up period; and (vi) operative time.

334.    Notwithstanding the foregoing, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely failed to submit a trigger point injection report containing the information required to seek reimbursement under CPT code 20553.

335.    On information and belief, Defendants also routinely failed to adequately document Covered Persons' informed consent when purportedly performing trigger point injections.

336.    On information and belief, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice also routinely failed to identify which, if any, alternative and/or additional procedures could benefit Covered Persons.

337.    On information and belief Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice failed to document medically sufficient rationales to justify the risks to the Covered Persons when purportedly performing trigger point injections.

338.    On information and belief, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice also purportedly administered trigger point injections to treat diagnoses of acute back pain.

339.    On information and belief, adequate time between injection sessions should be allowed to assess if the injection is providing long-lasting (as opposed to short-term) relief. However, patients at the Richmond Hill Clinic were often injected on multiple occasions with little to no documentation that they experienced **any** relief from the prior set of injections that they had already received, let alone long-lasting relief.

340.    On information and belief, documenting a patient's responses to injections is imperative for anyone involved in a patient's care, including the licensed professionals administering the injections, other licensed professionals who may treat the patient

contemporaneously or subsequently, the patients, and the insurers/payers. It is particularly critical for licensed professionals to have this information in order to decide whether to subject a patient to the risks of subsequent procedures.

341.    On information and belief, notwithstanding the importance of documenting patients' responses to injections, the Defendants routinely only recorded the Covered Persons' response as "the patient tolerated the procedure well," without complication or complaint, and without any further elucidation of the patient's response to the procedure.

342.    On information and belief, the Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice routinely failed to adequately document Covered Persons' self-reported pain levels, rendering it impossible to determine whether the injections benefitted the Covered Persons.

343.    On information and belief, Defendants Kanter Physical Medicine & Rehab and Miriam Kanter MD Practice often purportedly administered several separate trigger point injections during a single treatment session.

344.    By way of example but not limitation, Exhibit "22" in the accompanying Compendium of Exhibits contains a representative sample of claims where Defendants submitted bills for trigger point injections under CPT codes 20552 and/or 20553.

345.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0674121702-01; 0667974422-02; 0657524518-03; 0647267665-04; 0636237349-01; 0590067724-02; 0582981023-01; 0574471181-02; 0573726361-01; 0192564946-01; 0185036340-03; 0180004541-03; and 0172222127-03, in which Defendant Kanter, through Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, mailed or caused to be

mailed fraudulent claims for trigger point injections billed under codes 20552 and/or 20553, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

346. In furtherance of their scheme to defraud, Defendant Kanter Physical Medicine & Rehab also frequently inflated their charges for trigger point injections by representing that these procedures are performed using ultrasonic guidance, thereby providing Defendant Kanter Physical Medicine & Rehab with the option of submitting an additional charge under CPT code 76942.

347. On information and belief, determining the proper needle placement for trigger point injections is routine and simple; it is extremely rare that ultrasonic guidance would be necessary.

348. On information and belief, even assuming that ultrasonic guidance was medically necessary in these instances, which it was not, in order to properly bill under CPT Code 76942, the clinical need for ultrasonic guidance must be clearly supported in the medical record and an interpretation of the ultrasonic guidance must be documented in the patient's medical record.

349. On information and belief, Defendant Kanter Physical Medicine & Rehab routinely: (i) failed either to create and/or submit this necessary documentation when billing under CPT code 76942; (ii) failed to document why ultrasonic guidance was necessary when it was purportedly used; and (iii) failed to document interpretations of ultrasonic guidance when it was purportedly used. By way of example and not limitation, Exhibit "23" in the accompanying

Compendium of Exhibits is a spreadsheet identifying a representative sample of claims by Defendants under CPT code 76942.

350.    Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including but not limited to claim numbers 0486144868-01; 0503934937-02; 0521527176-04; 0527980874-02; 0535100036-02; 0573726361-01;    0574471181-02;    0582981023-01;    0590067724-02;    0636237349-01; 0647267665-04; 0657524518-03; 0667974422-02, and 0674121702-01 in which Defendant Kanter, through Kanter Physical Medicine & Rehab, mailed or caused to be mailed fraudulent claims for trigger point injections where Defendants billed for ultrasonic guidance under code 76942 while (i) failing to either create or submit documentation when billing under code 76942; (ii) failing to document why ultrasonic guidance was necessary; and (iii) failing to document interpretations of ultrasonic guidance when it was purportedly used, that were performed, if at all, pursuant to the fraudulent protocol of treatment described herein, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

**DISCOVERY OF THE FRAUD**

351.    On information and belief, to induce Plaintiffs to promptly reimburse their claims, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example, and not limitation:

- Defendants Kanter, Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice knowingly misrepresented and concealed facts in order to prevent Plaintiffs from discovering that the initial and follow-up evaluations, diagnostic testing, physical therapy services, and pain management injections for which they submitted bills to Plaintiffs were medically unnecessary and/or of no diagnostic or treatment value – to the extent such services were provided at all – pursuant to fraudulent pre-

determined protocol of treatment designed to maximize Defendants profits irrespective of each Covered Person's individualized need;

- Defendants Nissenbaum and Chiropractic Associates of RH knowingly misrepresented and concealed facts in order to prevent Plaintiffs from discovering that the chiropractic evaluations and services which they submitted bills to Plaintiffs were medically unnecessary – to the extent such services were provided at all – pursuant to fraudulent pre-determined protocol of treatment designed to maximize Defendants profits irrespective of each Covered Person's individualized need; and

- Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

352.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $2,900,000.00 based upon the fraudulent bill submissions.

353.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud, described above, Plaintiffs were not aware, did not discover, and should not have reasonably discovered the fraud until in or about February 2024.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS NISSENBAUM, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

354.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

355.    At all times relevant herein, Chiropractic Associates of Richmond Hill P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

356.    From at least 2008 through the present, Defendants Nissenbaum, John Does 1 through 20 and ABC Corporations 1 through 20 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Chiropractic Associates of Richmond Hill P.C. enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

357.    At all relevant times mentioned herein, Defendant Nissenbaum exerted control over, and directed the operations of Chiropractic Associates of Richmond Hill P.C. enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments on claims that were submitted for medically unnecessary chiropractic services performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement without regard to each Covered Person's individualized physical conditions, and irrespective of medical necessity.

358.    On information and belief, one or more of John Does 1 through 20 were associated with the Chiropractic Associates of Richmond Hill P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

359.    On information and belief, one or more of the ABC Corporations were associated with the Chiropractic Associates of Richmond Hill P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

360.    The racketeering acts set forth herein were carried out over a thirteen-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Chiropractic Associates of Richmond Hill P.C. enterprise to defraud insurers.

361.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Chiropractic Associates of Richmond Hill P.C. continues to pursue collection on the fraudulent bills to the present day.

362.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Chiropractic Associates of Richmond Hill P.C. enterprise based upon materially false and misleading information.

363.    Through the Chiropractic Associates of Richmond Hill P.C. enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

364.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme to defraud as well as the specific misrepresentations identified for each of the mailings.

365.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

366.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

367.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $870,000.00, the exact amount to be determined at trial.

368.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Defendants Nissenbaum, John Does 1 through 20 and one or more of the ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS KANTER, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

369.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

370.    At all times relevant herein, Kanter Physical Medicine & Rehab, P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

371.    From in or about 2012 through the present, Defendant Kanter, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Kanter Physical Medicine & Rehab, P.C. enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

372.    At all relevant times mentioned herein, Defendant Kanter exerted control over, and directed the operations of Kanter Physical Medicine & Rehab, P.C. enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical and physical therapy services, diagnostic testing, and pain management injections performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; and (b) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

373.    On information and belief, one or more of John Does 1 through 20 were associated with the Kanter Physical Medicine & Rehab, P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

374.    On information and belief, one or more of the ABC Corporations were associated with the Kanter Physical Medicine & Rehab, P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

375.    The racketeering acts set forth herein were carried out over a eleven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Kanter Physical Medicine & Rehab, P.C. enterprise to defraud insurers.

376.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Kanter Physical Medicine & Rehab, P.C. continues to pursue collection on the fraudulent bills to the present day.

377.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Kanter Physical Medicine & Rehab, P.C. enterprise based upon materially false and misleading information.

378.    Through the Kanter Physical Medicine & Rehab, P.C. enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

379.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

380.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

381.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

382.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,000,000.00, the exact amount to be determined at trial.

383.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Defendants Kanter, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS KANTER, JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

384.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

## **THE RICO ENTERPRISE**

385.    At all times relevant herein, Miriam Kanter, M.D., P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

386.    From in or about 2001 through the present, Defendant Kanter, John Doe Defendants 1 through 20 and ABC Corporations 1 through 20 were "persons" under the RICO statute and knowingly conducted and participated in the affairs of the Miriam Kanter, M.D., P.C. enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c). At all relevant times mentioned herein, Defendant Kanter exerted control over, and directed the operations of the Miriam Kanter, M.D., P.C. enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs seeking payments that were (a) submitted claims for medically unnecessary medical and physical therapy services, diagnostic testing, and pain management injections performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; and (b) submitted claims for reimbursement under billing codes that misrepresent and exaggerate the services purportedly provided Covered Persons.

387.    On information and belief, one or more of John Does 1 through 20 were associated with the Miriam Kanter, M.D., P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

388.    On information and belief, one or more of the ABC Corporations were associated with the Miriam Kanter, M.D., P.C. enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

389.    The racketeering acts set forth herein were carried out over a eleven-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Miriam Kanter, M.D., P.C. enterprise to defraud insurers.

390.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Miriam Kanter, M.D., P.C. continues to pursue collection on the fraudulent bills to the present day.

391.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Miriam Kanter, M.D., P.C. enterprise based upon materially false and misleading information.

392.    Through the Miriam Kanter, M.D., P.C. enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

393.    A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

394.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

395.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

396.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,200,000.00, the exact amount to be determined at trial.

397.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Defendants Kanter, John Does 1 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Common Law Fraud-Billing Fraud)

398.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

399.    Defendants Kanter, Nissenbaum, Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, and Miriam Kanter MD Practice, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.  As part of the fraudulent scheme, Kanter, Nissenbaum, Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, Miriam Kanter MD Practice, John Does 1 through 20 and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

400.    Defendants Kanter, Nissenbaum, Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, Miriam Kanter MD Practice, John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to Plaintiffs for reimbursement of No-fault benefits the Fraudulent Treatment Protocol were materially misrepresented.

401.    Defendants Kanter, Nissenbaum, Chiropractic Associates of RH, Kanter Physical Medicine & Rehab, Miriam Kanter MD , John Does 1 through 20 and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that, in many instances, the services relating to the Fraudulent Treatment Protocol were provided pursuant to a pre-determined

protocol that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiffs, as opposed to medical necessity.

402.    Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

a)    False and misleading statements and information designed to conceal the fact that Defendants provided services according to a treatment protocol intended to fraudulently bill Plaintiffs for *inter alia,* medical evaluations, diagnostic tests, pain management injections, chiropractic treatment, and physical therapy, irrespective of medical necessity;

b)    False and misleading statements and information in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not rendered as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

c)    False and misleading statements made by one or more Defendants in which Defendants recorded incomplete and/or fabricated patient complaints and/or medical histories to support pre-determined diagnoses to justify the billing for initial and follow-up examinations, diagnostic tests, pain management injections, chiropractic, and physical therapy, irrespective of medical necessity, and to justify referrals for chiropractic services with the intent to defraud Plaintiffs;

d)    False and misleading statements made by one or more Defendants concerning Covered Persons conditions in order to justify the billing almost identical physical therapy treatments to virtually every Covered Person irrespective of medical necessity;

e)    False and misleading statements made by one or more Defendants regarding Covered Persons' conditions in order to justify the provision of physical therapy services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

f)    False and misleading statements made by one or more Defendants through which they fraudulently diagnosed every Covered Person with spinal pain in one or more regions of the spine, sprains of one or more regions of the spine, and/or subluxation of more than one region of the spine in order to

justify the provision of chiropractic services which were provided, if at all, pursuant to an illegal treatment protocol irrespective of medical necessity;

g) False and misleading statements made by one or more Defendants in order to justify the billing for Electrodiagnostic Testing under CPT codes 95903, 95904, 95911, 95934, 95861, 95864, and/or 95886 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

h) False and misleading statements made by one or more Defendants in order to justify the billing for Computerized Range of Motion and Manual Muscle Testing under CPT Codes 95831, 95833, 95834, and/or 95851 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

i) False and misleading statements made by one or more Defendants in order to justify the billing for Trigger Point Injections and related ultrasonic guidance under CPT Codes 20552, 20553, and/or 76942 when in fact such services were never provided, not provided as billed, medically unnecessary and/or of no diagnostic or treatment value;

j) False and misleading statements contained in the initial and follow-up reports of one or more the Defendants concerning each patient's condition and/or diagnosis to justify the continued necessity of the Fraudulent Treatment Protocol irrespective of improvements in a Covered Person's condition; and

k) Other misrepresentations, including but not limited to those contained in paragraphs a through j above.

403. On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs in connection with the Fraudulent Treatment Protocol set forth fictional representations of each Covered Person's condition and services provided. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider.

404. The foregoing was intended to deceive and mislead the Plaintiffs into believing that Defendants were providing medically valid services when, in fact, they were not.

405.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

406.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiffs were led to believe existed as a result of Defendants' acts of fraud and deception.

407.    Had Plaintiffs known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendant's claims for No-fault insurance benefits submitted in connection therewith.

408.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

409.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $2,900,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

**FIFTH CLAIM FOR RELIEF**

**<u>AGAINST ALL DEFENDANTS</u>**

**(Unjust Enrichment)**

410.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

411.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received substantial moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

412.    Plaintiffs are entitled to recover restitution for the amount that Defendants were unjustly enriched as a result of payments made by Plaintiffs to said Defendants.

413.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and have been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $2,900,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTH CLAIM FOR RELIEF

## <u>AGAINST THE DEFENDANT PCs</u>

### (Declaratory Judgment)

414.    The allegations of paragraphs 1 through 353 are hereby repeated and realleged as though fully set forth herein.

415.    At all relevant times mentioned herein, each and every bill mailed by the Defendants, through the Defendant PCs, to Plaintiffs sought reimbursement for services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary.

416.    At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of

fraudulent billing documents pursuant to a fraudulent treatment protocol irrespective of medical necessity.

417.    In view of the Defendant PCs submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Defendant PCs have no right to receive payment for any pending bills they have submitted because:

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs as to the medical necessity of billed-for services, when such services, if performed at all, were performed pursuant to a pre-determined treatment protocol designed solely to maximize reimbursement for the Defendants;

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement for services that were never rendered, not provided as billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary; and

- The Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for services performed pursuant to illegal referral, kickback, and/or other financial arrangement(s) between the Defendants.

418.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the services purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that the Defendant PCs are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Defendant PCs' No-fault claims.

419.    Plaintiffs have no adequate remedy at law.

420.    The Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the

pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demands judgment as follows:

(i)     Compensatory damages in an amount in excess of $2,900,000.00, the exact amount to be determined at trial, together with prejudgment interest;

(ii)    Punitive damages in such amount as the Court deems just;

(iii)   Treble damages, costs, and reasonable attorneys' fees on the First through Third Claims for Relief, together with prejudgment interest;

(iv)    Compensatory and punitive damages on the Fourth Claim for Relief, together with prejudgment interest;

(v)     Compensatory damages on the Fifth Claim for Relief, together with prejudgment interest;

(vi)    Declaratory Relief on the Sixth Claim for Relief declaring that Plaintiffs are under no obligation to pay any of the Defendants' No-fault claims that were for services that were part of a predetermined protocol of treatment, never rendered, not of any diagnostic or treatment value, reflected a pattern of billing for services that were medically unnecessary and or were performed as a result of an unlawful referral, kickback, and/or other financial arrangement; and

(vii)   Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York
       February 7, 2025

                                    MANNING & KASS, ELLROD, RAMIREZ,
                                        TRESTER LLP

                                  By:   /s/ Lee Pinzow
                                        Robert A. Stern
                                        James McKenney
                                        Lee Pinzow
                                        *Attorneys for Plaintiffs*
                                        100 Wall Street, Suite 700
                                        New York, New York 10005
                                        (212) 858-7769

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> PLAINTIFFS, <br><br> -against- <br><br> CHIROPRACTIC ASSOCIATES OF RICHMOND HILL P.C., KANTER PHYSICAL MEDICINE & REHAB, P.C., MIRIAM KANTER, M.D., P.C., MIRIAM E. KANTER, M.D., STEVEN R. NISSENBAUM, D.C., JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20, <br><br> DEFENDANTS. | CIVIL ACTION <br><br> 25-CV-715 <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769